OFFICE OF THE ATTORNEY GENERAL
Edward Manibusan
Attorney General
Charles E. Brasington
Assistant Attorney General
Hon. Juan A. Sablan Mem. Bldg., 2nd Floor
Saipan, MP 96950-8907
Tel: (670) 237-7500
Fax: (670) 664-2349
e-mail: Charles_brasington@cnmioag.org
Attorney for Defendants

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE**
**NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| PAUL MURPHY,<br><br>              Plaintiff,<br><br>    v.<br><br>ROBERT A. GUERRERO, in his official capacity as Commissioner of the Department of Public Safety of the Commonwealth of the Northern Mariana Islands, and LARISSA LARSON, in her official capacity as Secretary of the Department of Finance of the Commonwealth of the Northern Mariana Islands,<br><br>              Defendants. | Civil Action No. 14-0026<br><br>**NOTICE OF MOTION AND CROSS MOTION FOR SUMMARY JUDGMENT**<br><br>**Date:   July 28, 2016**<br><br>**Time:   1:30 p.m.**<br><br>**Judge:  Ramona V. Manglona, C.J.** |

    **COMES NOW**, Defendant Robert A. Guerrero, in his official capacity as Commissioner of the Department of Public Safety for the Commonwealth of the Northern Mariana Islands, and Larrisa Larson, in her official capacity as Secretary of the Department of Finance for the Commonwealth of the Northern Mariana Islands, by and through counsel Charles E. Brasington, and hereby move the Court, pursuant to Federal Rule of Civil Procedure 56(a), for summary judgment as to all counts of the Plaintiff's Fourth Amended Complaint.

    In support of this Motion, the Commonwealth relies upon the Memorandum of Law that is

1

filed contemporaneously with this Motion.

RESPECTFULLY
SUBMITTED.

OFFICE OF THE ATTORNEY GENERAL

DATED: June 30, 2016

/s/  *Charles E. Brasington*
Charles E. Brasington
Assistant Attorney General
Attorney for Defendants

OFFICE OF THE ATTORNEY GENERAL
Edward Manibusan
Attorney General
Charles E. Brasington
Assistant Attorney General
Hon Juan A. Sablan Mem. Bldg., 2nd Floor
Saipan, MP 96950-8907
Tel: (670) 237-7500
Fax: (670) 664-2349
e-mail: charles_brasington@cnmioag.org
Attorney for Defendants

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE**
**NORTHERN MARIANA ISLANDS**

PAUL MURPHY,

     Plaintiff,

  v.

ROBERT A. GUERRERO, in his official
capacity as Commissioner of the Department
of Public Safety of the Commonwealth of
the Northern Mariana Islands, and LARISSA
LARSON, in her official capacity as
Secretary of the Department of Finance of
the Commonwealth of the Northern Mariana
Islands,

     Defendants.

Civil Action No. 14-0026

**MEMORANDUM IN SUPPORT OF**
**CROSS MOTION FOR SUMMARY**
**JUDGMENT**

**Date:** **July 28, 2016**

**Time:** **1:30**

**Judge:** **Ramona V. Manglona, C.J.**

TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................. 1

II.  STATEMENT OF UNDISPUTED FACTS ...................................... 1

III. STANDARD FOR SUMMARY JUDGMENT ............................... 2

IV.  ARGUMENT ...................................................................................... 3

     A. SECOND AMENDMENT ANALYSIS ............................................ 3

     B. THE BASIC REGISTRATION REQUIREMENT IMPOSES A *DE MINIMUS* BURDEN, AND IS
     CONSTITUTIONAL ............................................................................. 5

     C. STORAGE PROVISIONS OF SAFE ARE CONSTITUTIONAL .......... 6

        1. *Home Storage Under 6 CMC § 10204* ............................... 6

        2. *Transportation Provisions under 6 CMC § 10206* ........... 8

     D. INTERMEDIATE SCRUTINY APPLIES TO THE CALIBER RESTRICTION AND THE CALIBER
     RESTRICTION SURVIVES INTERMEDIATE SCRUTINY ......................... 8

     E. THE BAN ON LARGE CAPACITY AMMUNITION FEEDING DEVICES IS CONSTITUTIONAL
     BECAUSE INTERMEDIATE SCRUTINY APPLIES AND THE BAN ON LARGE CAPACITY
     AMMUNITION FEEDING DEVICES PASSES INTERMEDIATE SCRUTINY ............ 11

        1. *Intermediate Scrutiny Applies* ...................................... 12

        2. *The Ban on Large Capacity Ammunition Feeding Devices Survives
        Intermediate Scrutiny* ........................................................ 13

           a. Protecting Public Safety is an Important Interest .......... 13

           b. Ban on LCMs is Narrowly Tailored and Substantially Related to the
           Objective in Preserving Public Safety ............................... 15

     F. THE BAN ON ASSAULT RIFLES IS CONSTITUTIONAL BECAUSE INTERMEDIATE SCRUTINY
     APPLIES AND THE BAN ON ASSAULT RIFLES PASSES INTERMEDIATE SCRUTINY ............ 16

   *1. Intermediate Scrutiny Applies*................................................................................ 16

   *2. The Assault Rifle Ban Passes Intermediate Scrutiny* ........................................... 18

 G. TAX ON HANDGUNS IS CONSTITUTIONAL BECAUSE IT IS WITHIN THE

  COMMONWEALTH'S POWER TO TAX, IS A REVENUE GENERATING MEASURE,

  IS LIMITED IN TIME, AND THERE IS A PERVASIVE HISTORICAL EVIDENCE OF

  LEVYING EXCISE TAXES ON FIREARMS .......................................................... 19

   *1. Legislative Power & Control over Customs* ......................................... 20

   *2. The Power to Tax* ................................................................................ 20

   *3. Taxation of Firearms by the Federal Government* ................................. 23

   *4. Application* ......................................................................................... 24

V.  CONCLUSION ........................................................................................ 24

## <u>Cases</u>

*Brown v. Entm't Merchants Ass'n,*
   564 U.S. 786 (2011) ............................................................................ 4

*Celotex Corp. v. Catreit,*
   477 U.S. 317 (1986) ............................................................................ 1

*Child Labor Tax Case,*
   259 U.S. 20 (1922) .......................................................................... 21

*City of Renton v. Playtime Theatres, Inc.,*
   475 U.S. 41 (1986) .................................................................... 13, 15

*Dep't of Revenue of Montana v. Kurth Ranch,*
   511 U.S. 778 (1994) .................................................................. 21–22

*District of Columbia v. Heller (Heller I),*
   554 U.S. 603 (2008) ........................................................ 3–6, 8, 9, 24

*Fernandez v. Wiener,*
   326 U.S. 340 (1945) .......................................................................... 21

*Friedman v. City of Highland Park, Ill.,*
   784 F.3d 406 (7th Cir. 2015) ............................................................ 25

*Fyock v. Sunnyvale,*
   779 F.3d 991 (9th Cir. 2015) ...................................................... 12–14

*Heller v. District of Columbia (Heller II),*
   670 F.3d 1244 (D.C. Cir. 2011) ............................ 6, 12, 14, 16–18

*Heller v. District of Columbia (Heller III),*
   801 F.3d 264 (D.C. Cir. 2015) ...................................................... 5, 6

*Jackson v. City & Cnty. of San Francisco,*
   746 F.3d 953 (2015) ............................................ 4–7, 9, 12–14, 17, 24

*Justice v. Town of Cicero,*
   577 F.3d 768 (7th Cir. 2009) ............................................................ 6

*Kolbe v. Hogan,*
   813 F.3d 160 (4th Cir. 2016) ...................................................... 12, 16

*McDonald v. Chicago,*
   561 U.S. 742 (2010) ............................................................................ 3

*Minn. Star & Tribune Co. v. Minn. Comm'r of Revenue,*
   460 U.S. 575 (1983) .................................................................. 21–24

i

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,

    132 S. Ct. 2566 (2012) ................................................................................. 20

*Nat'l Shooting Found., Inc. v. Jones*,

    716 F.3d 200 (D.C. Cir. 2013) ......................................................................... 1

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*,

    210 F.3d 1099 (9th Cir. 2000) ......................................................................... 3

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,

    804 F.3d 242 (2d Cir. 2015) ........................................................... 12, 15–17

*Pepper & Tanner, Inc. v. Shamrock Broad., Inc.*,

    563 F.2d 391 (9th Cir. 1977) ......................................................................... 3

*Radich v. Deleon Guerrero*,

    Civ. No. 14-0020 .............................................................................................. 1

*Reno v. Catholic Social Services, Inc.*,

    509 US 43 (1993) ........................................................................................... 20

*Rosario v. Rockefeller*,

    410 U.S. 752 (1973) ......................................................................................... 5

*Staples v. United States*,

    511 U.S. 600 (1994) ......................................................................................... 9

*Starr v. Campos*,

    655 P.2d 794 (Ariz. Ct. App. 1982) ............................................................ 14

*Turner Broad. Sys., Inc. v. FCC*,

    520 U.S. 180 (1997) ....................................................................................... 15

*United States v. Chovan*,

    735 F.3d 1127 (9th Cir. 2013) ............................................................ 4, 5, 13

*Shew v. Malloy*,

    944 F. Supp. 2d 234 (D. Conn. 2014)270 F.3d 203 (5th Cir. 2001) ..................................... 16

*Sonzinsky v. United States*,

    300 U.S. 513 (1937) ........................................................................... 19–21, 24

*United States v. Carlton*,

    512 U.S. 26 (1994) ........................................................................................ 22

*United States v. Lee*,

    445 U.S. 252 (1982) ............................................................................... 20, 22

*United States v. Masciandaro*,

    638 F.3d 458 (4th Cir. 2011) ................................................................ 9

*Vivid Entm't, LLC v. Fielding*,

    774 F.3d 566 (9th Cir. 2014) ............................................................... 15

*Ward v. Rock Against Racism*,

    491 U.S. 781 (1989) ............................................................................ 15


**Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, 48 U.S.C. § 1801 note**

Covenant § 206 ..................................................................................... 19

Covenant § 501 ..................................................................................... 20

Covenant § 602 ..................................................................................... 20

Covenant § 604 ..................................................................................... 20


**Constitutional Provisions**

U.S. Const. amend. II............................................................................. 3


**Statutes**

26 U.S.C. § 4281.................................................................................... 23

3 CMC § 1402(3).................................................................................... 24

6 CMC § 2222........................................................................................ 11

6 CMC § 10101(e)(1)(i)......................................................................... 17

6 CMC § 10204................................................................................. 6–8, 10

6 CMC § 10206................................................................................... 8–11

6 CMC § 10206...................................................................................... 11

San. Fran., Cal. Pol. Code § 4512 .......................................................... 6

**Regulations**

NMIAC § 150-70-120......................................................................................................... 6


**Rules**

Fed. R. Civ. P. 56(a) .......................................................................................................... 2


**Public Laws**

Revenue Act of 1918, Pub. L. No. 254, §900(10) ........................................................... 23

National Firearms Act of June 26, 1934, c. 757, 48 Stat. 1236 ...................................... 24

Public Law 19-42 ....................................................................................................... 2, 24


**Secondary Sources**

*Citizens Crime Comm'n of N.Y. City, NYC & LA City Councils Introduce Rezo for Federal Ban*
   *on Large Capacity Ammunition Magazines* (Mar. 2, 2011),
      http://www.nycrimecommission.org/pdfs/CrimeCmsnNYCLACouncils.pdf........................ 15

*Guns Stolen from Vehicles Increasingly Used in Violent Crime*, CBS San Francisco Bay Area
   (Aug. 25, 2015), http://sanfrancisco.cbslocal.com/2015/08/25/guns-stolen-from-
   vehicles-increasingly-used-in-violent-crime/ ......................................................... 10

Bureau of Labor Stats., CPI Inflation Calculator,
   http://www.bls.gov/data/inflation_calculator.htm ................................................. 24

Philip J. Cook et al., *Gun Control After Heller: Threats and Sideshows from A Social Welfare*
   *Perspective*, 56 UCLA L. Rev. 1041 (2009) ........................................................... 23

Everytown for Gun Safety, *#notanaccident*,
   http://everytownresearch.org/notanaccident/ ...........................................................7

Everytown for Gun Safety, *Innocents Lost* (June 24, 2014),
   http://everytownresearch.org/reports/innocents_lost/ ...................................... 7, 11

S. Fallis & James V. Grimaldi, *Virginia Data Show Drop in Criminal Firepower During Assault*

*Gun Ban*, Wash. Post (Jan. 23, 2011), http://www.washingtonpost.com/wp-
dyn/content/article/2011/01/22/AR2011012203452.html ...................................... 15

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self–
Defense with a Gun*, 86 J. Crim. L. & Criminology 150 (1995) ..................................... 12–13

The Gun Violence Archive,
http://www.gunviolencearchive.org/ .................................................................... 10

David C. Grossmann et al., *Gun Storage Practices and Risk of Youth Suicide and
Unintentional Firearm Injuries*, 293 JAMA Pediatrics 707 (2005) ......................... 7

Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban:
Impacts on Gun Markets and Gun Violence, 1994–2003* 87 (2004) ......................... 14, 18–19

Lynn Langton, *Firearms Stolen During Household Burglaries and Other Property Crimes,
2005–2010*, U.S. Dep't of Just. 3 (Nov. 2012),
http:// www.bjs.gov/content/pub/pdf/fshbopc0510.pdf ............................................. 8

Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings* 3 (Jan. 2013),
http://libcloud.s3.amazonaws.com/9/56/4/1242/1/analysis-of-recent-mass-
shootings.pdf ......................................................................................... 13, 14, 18

Leo P. Martinez, *Of Fairness and Might: The Limits of Sovereign Power to Tax
After* Winstar, 28 Ariz. St. L.J. 1193 (1996).................................................... 20–22

Tracy A. Kaye & Stephen W. Mazza, *United States-National Report:
Constitutional Limitations on the Legislative Power to Tax in the United States*,
15 Mich. St. J. Int'l L. 481 (2007) ...................................................................... 22

Leo P. Martinez, *"To Lay and Collect Taxes": The Constitutional Case for
Progressive Taxation*, 18 Yale L. & Pol'y Rev. 111, 114 (1999) ......................... 22

Asha Rangappa, *The Cost of Freedom: Using the Tax Power to Limit Personal Arsenals*,
32 Yale L. & Pol'y Rev. inter Alia 17 (2013) .............................................. 7–8, 23

Section By Section Analysis of the Covenant (1975).................................................. 20

Marianne W. Zawitz, Guns Used in Crime,
Dep't of Just. 3 (July 1995), http://www.bjs.gov/content/pub/pdf/GUIC.pdf ......................... 8

v

# I. INTRODUCTION[1]

Plaintiff Paul Murphy argues that the Commonwealth infringes upon his Second Amendment rights by: (1) restricting the possession and importation of long guns[2] of calibers greater than .22, .223, and .410; (2) requiring the registration of firearms and firearm owners; (3) banning the possession of "assault rifles"; (4) banning large capacity magazines ("LCMs"); (5) requiring unattended firearms in the home to be locked in a safe; (6) requiring firearms to be transported unloaded and separate from ammunition; (7) imposing a $1,000 excise tax on every handgun imported into the Commonwealth.

# II. STATEMENT OF UNDISPUTED FACTS

Murphy is a citizen of the United States and of the Commonwealth. (3rd Am. Compl. ¶ 7; Answer ¶ 7.) On July 30, 2007, Murphy attempted to bring a Glock 19 9 mm (.30 caliber) handgun, a 7.62 × 39 mm caliber WASR 10/63 rifle, several varieties of 7.62 × 39 mm ammunition, and a 9 mm bullet into the Commonwealth. (Ex. 13.)[3] These items were confiscated. (*Id.*) Murphy caused the firearms to be transferred to Guam for safekeeping. (Ex. 14.) At least some of the ammunition is in the custody of the Department of Public Safety. (Ex. 13.)

Murphy was issued a Weapons Identification Card in September 20, 2007, (Ex. 4). The most recent Weapons Identification Card issued to Murphy expired on April 10, 2015. (Ex. 5.) It is unclear whether Murphy currently possesses a valid Weapons Identification Card as required by law. If it has expired, the Commonwealth urges him to renew his card to avoid criminal liability

---

[1] Defendants are referred to in this Memorandum as "the Commonwealth."

[2] Courts use the term "long gun" to refer to rifles and shotguns. *See, e.g.*, *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 205 (D.C. Cir. 2013) ("Mexican cartels have made long guns (i.e. rifles and shotguns) their new 'weapons of choice.'"). The term "firearm" is in this Memorandum to refer collectively to handguns, rifles, and shotguns.

[3] This Memorandum refers to Exhibits 1–24, filed by Murphy on Sept. 14, 2015, at ECF No. 47, 47-1 to 47-25.

or undermining his standing to bring the case.

The Parties to this case briefed and argued motions for summary judgment under a Murphy's Fourth Amended Complaint. However, before an order was issued, this Court issued its decision in *Radich v Deleon Guerrero*, 14-cv-00020, on March 28, 2016, striking down the Commonwealth's ban on the possession of handguns by private citizens for self defense as a violation of the Second Amendment. The Commonwealth acted swiftly to enact the Special Act for Firearms Enforcement (SAFE), Public Law 19-42, which was originally proposed by the Office of the Attorney General. The Office of the Attorney General drafted the provisions after reviewing the laws of other U.S. jurisdictions and Second Amendment case law, in an effort to provide comprehensive legislation that protected public safety while protecting Second Amendment Rights. The Court denied the motions based on mootness, and Murphy filed his current complaint, renewing his original challenges as well as challenging provisions under SAFE.

## III.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must identify the pleadings, depositions, affidavits, or other evidence that it "believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The burden of establishing the nonexistence of a 'genuine issue' is on the party moving for summary judgment." *Id.* at 330. (citations omitted). "This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." *Id.* "If the movant fails to discharge his initial burden of production, then the Court is not required to determine whether the movant has satisfied his burden of persuasion." *Id.* Further, "[i]f a moving party fails to carry its initial burden of production, the nonmoving party has no

obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). In addition, "[w]hile suitable inferences may be drawn by the trial court in ruling on a motion for summary judgment, all such inferences are to be drawn against the moving party." *Pepper & Tanner, Inc. v. Shamrock Broad., Inc.*, 563 F.2d 391, 395 (9th Cir. 1977).

## IV.  ARGUMENT

### A.  SECOND AMENDMENT ANALYSIS

The Second Amendment provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II. The U.S. Supreme Court has held that the Second Amendment protects the right of individuals to own handguns, and to keep firearms in the home for self-defense purposes. *District of Columbia v. Heller (Heller I)*, 554 U.S. 603 (2008). The Supreme Court later held that the Second Amendment applies to the several States through the due process clause of the Fourteenth Amendment. *McDonald v. Chicago*, 561 U.S. 742 (2010). Under Section 501(a) of the Covenant, [4] both the Second and Fourteenth Amendments apply to the Commonwealth "as if the Northern Mariana Islands were one of the Several States." Covenant § 501(a).

Importantly, the U.S. Supreme Court's holding in *Heller I* was limited. In *Heller I*, the Court cautioned: "the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. The Court continued:

> Nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the

---

[4] Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, 48 U.S.C. § 1801 note [hereinafter Covenant].

carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id*. at 626–27. Indeed, the Court went so far as to describe the forgoing examples as a non-exhaustive list of "presumptively lawful regulatory measures." *Id*. at 626–27 n.26.

The Supreme Court did not identify a level of scrutiny for Second Amendment challenges. As such, the U.S. Court of Appeals for the Ninth Circuit, like many of its sister circuits, adopted a two-step approach based largely on First Amendment jurisprudence. *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014) *cert. denied*, 135 S. Ct. 2799, 192 L. Ed. 2d 865 (2015). When considering Second Amendment challenges to legislation, courts in the Ninth Circuit "(1) ask[] whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, [] apply an appropriate level of scrutiny." *Jackson*, 746 F.3d at 960 (quoting *United States v. Chovan*, 735 F.3d 1127, 1136–37 (9th Cir. 2013)).

In applying the first step, courts in the Ninth Circuit "ask 'whether the challenged law burdens conduct protected by the Second Amendment,' based on a 'historical understanding of the scope of the [Second Amendment] right,' or whether the challenged law falls within a 'well-defined and narrowly limited' category of prohibitions 'that have been historically unprotected.'" *Jackson*, 746 F.3d at 960 (quoting *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 792 (2011); *Heller I*, 554 U.S. at 625; and *Chovan*, 735 F.3d at 1136). To determine "whether a challenged law falls outside the historical scope of the Second Amendment," courts "ask whether the regulation is one of the 'presumptively lawful regulatory measures' identified in *Heller I*, or whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment." *Id*.

In applying the second step, courts in the Ninth Circuit must first identify the applicable level of scrutiny: intermediate or strict. Courts identify the appropriate level of scrutiny by considering two prongs: (a) "how close the law comes to the core of the Second Amendment right"

and (b) "the severity of the law's burden on the right."  *Id*. at 960–61 (quoting *Chovan*, 735 F.3d at 1138). As to step 2(a),[5] "the Second Amendment has 'the core lawful purpose of self-defense,' and that 'whatever else it leaves to future evaluation, [the Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Id*. at 961 (quoting *Heller I*, 554 U.S. at 630, 635). As to step 2(b), "laws which regulate only the 'manner in which persons may exercise their Second Amendment rights' are less burdensome than those which bar firearm possession completely." *Id*. (quoting *Chovan*, 735 F.3d at 1138). Furthermore, "firearm regulations which leave open alternative channels for self-defense are less likely to place a severe burden on the Second Amendment right than those which do not." *Id*.

## B. THE BASIC REGISTRATION REQUIREMENT IMPOSES A *DE MINIMUS* BURDEN, AND IS CONSTITUTIONAL.

The basic registration requirement for firearms and firearm owners under Commonwealth law is constitutional. First, firearm registration requirements are long standing, and are presumptively constitutional under *Heller*, 544 U.S. 626–27.  Second, basic registration requirement is a de minimus burden. The fact that the registration scheme incidentally impacts an individual constitutional right is of no consequence, as basic registration requirements for voting are ubiquitous throughout the several States and territories. *See Rosario v. Rockefeller*, 410 U.S. 752, 754–58 (1973) (requiring registration 30 days before general election did not violate right to vote).

Title 6, § 2204 requires an individual to possess a Weapons Identification Card before he or she acquires or possesses a firearm or dangerous device. Section 2204 is constitutional because basic registration and licensing requirements are longstanding and presumptively lawful. *Heller v.*

---

[5] As the Ninth Circuit's Second Amendment analysis uses a bifurcated second step, this Memorandum will refer to the two parts of the second step as 2(a) and 2(b).

*District of Columbia (Heller III)*, 801 F.3d 264, 274–75 (D.C. Cir. 2015) (registration of long guns); *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1254 (D.C. Cir. 2011) (registration of handguns); *Justice v. Town of Cicero*, 577 F.3d 768, 773–75 (7th Cir. 2009) (holding local ordinance "requiring the registration of all firearms" is consistent with the Supreme Court's ruling in *Heller I*). Many states had created firearm registration requirements by the end of the 1920s. *See Heller II*, 670 F.3d at 1253–55. Furthermore, the Court of Appeals for the District of Columbia explained that registration requirements are "self-evidently de minimis, for they are similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous." *Heller II*, 670 F.3d at 1254–55. The cost of registering a firearm is $25 per firearm. NMIAC § 150-70-120. This is a de minimus burden. As the basic registration requirements are longstanding and only place a de minimus burden on the registrant, heightened scrutiny does not apply. *Jackson*, 746 F.3d at 960.

### C. Storage Provisions of SAFE are Constitutional.

#### 1. Home Storage Under 6 CMC § 10204

The home storage provisions in 6 CMC § 10204 are constitutional because they pass intermediate scrutiny under the same analysis as in *Jackson*, 746 F. 3d 953. As stated previously, in drafting the proposal for SAFE, the Office of the Attorney General drew, wherever possible, on laws from other jurisdictions that had been subjected to, and survived, Second Amended Scrutiny. The Office of the Attorney General specifically chose to incorporate the provision upheld in *Jackson*, with minor modifications. *Compare* 6 CMC § 10204 *with* San Fran., Cal. Pol. Code § 4512.

Intermediate scrutiny applies to § 10204 for the same reason that intermediate scrutiny applied in *Jackson*: although the regulations in § 10204 regulates conduct within the scope of the Second Amendment, and requiring that unattended firearms be carried on the person, locked in a

safe, or disabled with a trigger lock burdens the exercise of self-defense in the home, § 10204

"does not substantially prevent law-abiding citizens from using firearms to defend themselves in

the home," but only regulates "the manner in which persons may exercise their Second

Amendment rights." 746 F.3d at 962–64. Otherwise stated, § 10204 does not prevent an individual

from using firearms for self-defense of the home. *Id.* at 964–65. As in *Jackson*, the Commonwealth

has an important governmental interest in reducing the number of firearm fatalities in the home,

especially among children, and preventing firearms from being stolen. See *id.* at 965–66. As in

*Jackson*, § 10204 is substantially related to the goals of preventing firearm related injury and death

and preventing theft of firearms. *Id.* at 966. The number of children killed by firearms every year

in the United States is alarmingly high. Everytown for Gun Safety, *#notanaccident*,

http://everytownresearch.org/notanaccident/ (last visited June 24, 2016) (interactive map)

[hereinafter Everytown Survey]; Everytown for Gun Safety, *Innocents Lost* (June 24, 2014),

http://everytownresearch.org/reports/innocents_lost/. There is substantial evidence that keeping

unattended firearms securely stored prevents firearm injury and death. David C. Grossmann et al.,

*Gun Storage Practices and Risk of Youth Suicide and Unintentional Firearm Injuries*, 293 JAMA

Pediatrics 707 (2005). Officer David Hosono, the Parties' stipulated expert, testified that the

firearm instructorship trainings that he attended taught that proper firearm storage was *more*

*rigorous* than what § 10204 requires: securing an unattended firearm *unloaded* and in a locked

container. Tr. of Evid. Hearing at 27 (June 22, 2016).

    Theft is another major concern. Indeed, when the Office of the Attorney General was

considering provisions to recommend the legislature, the theft of handguns was an overriding

concern. Evidence demonstrates there is cause for concern. "More than 232,400 firearms are stolen

each year, with household burglaries accounting for almost three times as many stolen guns as

other property crimes." Asha Rangappa, *The Cost of Freedom: Using the Tax Power to Limit*

*Personal Arsenals*, 32 Yale L. & Pol'y Rev. inter Alia 17, 18 (2013) (quoting Lynn Langton, *Firearms Stolen During Household Burglaries and Other Property Crimes, 2005–2010*, U.S. Dep't of Just. 3 (Nov. 2012), http:// www.bjs.gov/content/pub/pdf/fshbopc0510.pdf.). According to Lynn Langton's study, "[i]n 83% of burglaries and 85% of other property crimes that involved a stolen firearm, none of the stolen guns had been recovered" by the time the data was collected. Langton, *Firearms Stolen During Household Burglaries and Other Property Crimes, 2005–2010*, at 4. Stolen firearms are frequently used in crime by individuals, such as violent felons, who are barred from owning a firearm legally. Marianne W. Zawitz, *Guns Used in Crime*, Dep't of Just. 3 (July 1995), http://www.bjs.gov/content/pub/pdf/GUIC.pdf. Requiring firearms to be stored in a locked container is substantially related to the goal of protecting public safety and preventing firearms from being stolen. The storage provisions of 6 CMC § 10204 therefore pass intermediate scrutiny.

### 2. Transport Provisions Under 6 CMC § 10206

The analysis for transporting firearms largely mirrors the home storage provision. As for the first step, whether the regulation falls outside the scope of the Second Amendment, it appears that the regulated conduct is within the scope of the Second Amendment. it is clear that § 10206 regulates conduct within the scope of the Second Amendment. Regulation of transportation is not one of the presumptively lawful rights identified in *Heller I*. As for history, the Commonwealth has been unable to locate historic regulations like the one in question. Therefore, the Commonwealth will assume at this juncture that the provision in question falls within the scope of the Second Amendment.

Turning to the applicable level of scrutiny, intermediate scrutiny is appropriate because the requirements of § 10206 do not come very close to the core of the Second Amendment right, and §10206's burden on *that* right is not severe. The core of the Second Amendment right is "the lawful

purpose of self-defense," especially "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Jackson*, 746 F.3d at 961 (quoting *Heller I*, 554 U.S. at 630, 635). Here, while self-defense is implicated, it occurs outside the home. Other courts have described the issue of the right to carry a loaded firearm in public as "a vast terra incognita that courts should enter only upon necessity *and only then by small degree*." *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011) (Wilkinson, J., concurring) (emphasis added). Whatever the case, the government's interest in regulating firearms that are being used in public, where innocent bystanders are put at risk, is far, far greater than regulating conduct that occurs in an individual's home.[6]

The burden on the right of self-defense by the core Second Amendment right conduct is not overly severe. It is clear that it does not destroy the right to self-defense. *Jackson*, 746 F.3d at 961. Like the storage provision, § 10206 makes it more difficult to use a firearm in self-defense when in a car or on foot. In a car, the firearm must be secured in the vehicle's trunk or stored in a locked container. 6 CMC § 10206(b). If the firearm is being transported on foot, it must be stored in a locked container and be kept separate from any ammunition. 6 CMC § 10206(c). In all cases the firearm must be unloaded and stored separately from ammunition. An individual wishing to use their firearm for self-defense would need to open the trunk (or locked container), retrieve the ammunition, and load the weapon before firing. However, the right to self-defense outside the home has not been established by the Ninth Circuit or the U.S. Supreme Court, and regulations on the transportation of firearms in public are less severe than those regulating conduct in a private

---

[6] If Murphy is seeking a ruling that the Commonwealth is required to allow some kind of carry regime, § 10206 is not the target. Most carry regimes require special licensure, and if the Second Amendment ultimately requires States and territories to offer a carry requirement, the Commonwealth would enact legislation, following the example of other states, to license individuals to carry loaded firearms in public. However, if this state of affairs comes to pass, § 10206 would still constitutionally apply to individuals that are not licensed to carry loaded firearms in public.

citizen's home.

The provisions of § 10206 pass intermediate scrutiny. As with §10204, the Commonwealth has important, substantial interests in preserving public safety, especially protecting the lives of children. The previously cited figures of children being the victims, or perpetrators, of accidental firearm violence are not restricted to the home. The Everytown Survey cited in the previous subsection has endeavored to record all accidental shootings occurring in America since 2015. An example is that of Patrice Price, who was shot and killed by her two-year-old son, who found a loaded handgun in the backseat of his mother's boyfriend's car and discharged it into the back of her head. Ms. Price died within minutes. http://everytownresearch.org/notanaccident/#2077. Another incident is that of Jamie Gilt, whose four-year-old son found a handgun under the back seat of the family truck, and accidentally discharged it into her back. Ms. Gilt survived. The Gun Violence Archive, found at http://www.gunviolencearchive.org/, keeps records of numerous firearm arm statistics, including the incidents in which a firearm is used defensively and is updated regularly. A collation of data for 2016 indicates that 278 children (0-11) and 1,428 teenagers (12-17) have been injured or killed as of June 28, 2016, and there have been 1,106 accidental shootings in the same time period. *Id*. It is beyond doubt that the Commonwealth has an important interest in preventing accidental shootings, whether in the home or in vehicles. Finally, the Commonwealth has an interest in preventing theft. This is a real concern as police departments around the country have started warning citizens about the danger of keeping an unsecured firearm in a car, even a locked car. *Guns Stolen from Vehicles Increasingly Used in Violent Crime*, CBS San Francisco Bay Area (Aug. 25, 2015), http://sanfrancisco.cbslocal.com/2015/08/25/guns-stolen-from-vehicles-increasingly-used-in-violent-crime/.

The requirements of § 10206 are substantially related to the important government interest in protecting public safety. Requiring firearms to be locked and unloaded prevent accidental

shooting. Everytown study of children killed by firearms between December 2012 to December 2013 concluded "Of the child shooting deaths in which there was sufficient information available to make the determination, 70 percent (62 of 89 cases) could have been prevented if the firearm had been stored locked and unloaded." Everytown for Gun Safety, Innocents Lost (June 24, 2014), http://everytownresearch.org/reports/innocents_lost/. "By contrast, incidents in which an authorized user mishandled a gun—such as target practice or hunting accidents—constituted less than thirty percent of the incidents." *Id*. Section 10206 directly addresses the important need to prevent accidental child shootings. Finally, the Parties' stipulated expert Officer Hosono testified that firearm instructors emphasize that when transporting a firearm, the firearm should be stored separately from ammunition in a locked in a box or stored in the trunk. Tr. of Evid. Hearing at 28 (June 22, 2016). This is precisely what § 10206 requires. The evidence is clear: locking up guns while unattended reduces the number of incidents of accidental shootings and reduces the risk of theft.

**D. INTERMEDIATE SCRUTINY APPLIES TO THE CALIBER RESTRICTION AND THE CALIBER RESTRICTION SURVIVES INTERMEDIATE SCRUTINY.**

The SAFE's caliber restriction is constitutional because it survives intermediate scrutiny. The Parties briefed this issue extensively in the last round of Motions for Summary Judgment. The caliber restriction was not abandoned in SAFE. Rather, its citation changed from 6 CMC § 2222(e) to 6 CMC § 10208(a)(6). As neither Party has any further argument on this point, the Parties have stipulated to submit the issue on the briefs previously filed with this Court at ECF No. 95.

**E. THE BAN ON LARGE CAPACITY AMMUNITION FEEDING DEVICES IS CONSTITUTIONAL BECAUSE INTERMEDIATE SCRUTINY APPLIES AND THE BAN ON LARGE CAPACITY AMMUNITION FEEDING DEVICES PASSES INTERMEDIATE SCRUTINY.**

The ban on magazines exceeding ten rounds is constitutional because intermediate scrutiny applies and the ban on magazines passes intermediate scrutiny. Although the ban on large capacity

magazines (LCMs) impinges on Second Amendment rights, intermediate scrutiny is proper

because the ban on LCMs is not substantially burden the Second Amendment right to self-defense

of hearth and home. Rather, it only regulates the manner in which an individual exercises their

Second Amendment right and does not render lawfully possessed firearms inoperable. *See Fyock*

*v. Sunnyvale*, 779 F.3d 991, 999 (9th Cir. 2015) (application of intermediate scrutiny not an abuse

of discretion); *see also N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 260 (2nd Cir. 2015)

(intermediate scrutiny); *Heller II*, 670 F.3d at 1262 (intermediate scrutiny); *but see Kolbe v.*

*Hogan*, 813 F.3d 160,179–80 (4th Cir. 2016) (applying strict scrutiny). The ban on LCMs passes

intermediate scrutiny because the Commonwealth has an important government interest in public

safety, and there is a reasonable fit between the ban on LCMs and public safety because evidence

demonstrates that LCMs have been disproportionately used in mass shootings and large capacity

magazines result in "more shots fired, persons wounded, and wounds per victim than do other gun

attacks." *Cuomo*, 804 F.3d at 263–64; *Fyock*, 779 F.3d at 1000; *Heller II*, 670 F.3d at 1263–64.

### 1. Intermediate Scrutiny Applies

Intermediate Scrutiny applies to the ban on LCMs. It is clear that regulations on

ammunition capacity fall within the scope of the Second Amendment, as regulation of magazine

capacity is not one of the "presumptively lawful" regulations identified by *Heller I*, and the

Commonwealth has not been able to locate historic regulations of ammunition capacity, though

case law has referenced some degree of historic regulation of ammunition capacity of semi-

automatic weapons. *See Fyock*, 779 F.3d at 997. The next line of inquiry is how close the ban on

LCMs comes to the core of the Second Amendment right (i.e., self defense) and the severity of the

burden on that right. *Jackson*, 746 F.3d at 960–61. Here, the ban on LCMs does not prohibit the

possession of the quintessential self-defense weapon, i.e., handguns. *Heller II*, 670 F.3d at 1261–

62 (citing Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of*

*Self–Defense with a Gun*, 86 J. Crim. L. & Criminology 150, 185 (1995) (revolvers and semi-automatic pistols are together used almost 80% of the time in incidents of self-defense with a gun)). Furthermore, the LCM ban does not prevent an individual from owning a semi-automatic rifle, including .223 caliber AR-15s, for self-defense. *Id*. at 1262. The ban does not effectively disarm individuals, but merely restricts the ammunition capacity of semi-automatic firearms.

     2.   *The Ban on Large Capacity Ammunition Feeding Devices Survives Intermediate Scrutiny.*

     The ban on LCMs survives intermediate scrutiny because the Commonwealth has a significant, substantial, and important interest in public safety, and there is a reasonable fit between the ban on LCMs and protecting public safety. "Intermediate scrutiny 'require[s] (1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective.'" *Fyock*, 779 F.3d at 1000 (quoting *Chovan*, 735 F.3d at 1139).

     a.   <u>Protecting Public Safety is an Important Interest</u>

     The first step in intermediate scrutiny is to determine the Commonwealth's objective in banning LCMs, and whether that interest is important. "In considering a [government's] justifications for its ordinance, we do not impose 'an unnecessarily rigid burden of proof . . . so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.'" *Jackson*, 746 F.3d at 965 (9th Cir. 2014) (2015) (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50–52 (1986)). Here, the goal of restricting LCMs is to protect public safety by reducing the number of rounds that a shooter can use in a fire fight. The reasons for banning LCMs is clear. A study analyzing 93 mass shootings between January 2009 and September 2013 revealed that incidents where assault weapons and large capacity magazines were involved "resulted in an average of 14.4 total people shot — 151% more people shot than in other incidents (5.7) — and 7.8 deaths — 63% more deaths than in other incidents (4.8)." Mayors

Against Illegal Guns, *Analysis of Recent Mass Shootings* 3 (Jan. 2013), http://libcloud.s3.amazonaws.com/9/56/4/1242/1/analysis-of-recent-mass-shootings.pdf. Another study demonstrates that:

> [C]ontrolling for gunfire, guns used in shootings are 17% to 26% more likely to have LCMs than guns used in gunfire cases resulting in no wounded victims (perhaps reflecting higher numbers of shots fired and victims hit in LCM cases), and guns linked to murders are 8% to 17% more likely to have LCMs than guns linked to non-fatal gunshot victimizations (perhaps indicating higher numbers of shots fired and wounds per victim in LCM cases).

Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003* 87 (2004), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf. Semiautomatic firearms with LCMs are even dangerous in legitimate self-defense situations because "the tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders." *Heller II*, 670 F.3d at 1263–64. Finally, the Parties' stipulated expert, Officer Hosono, testified that the concern of LCM from a law enforcement perspective is the ability of an active shooter to fire more rounds without reloading, and thereby endangering more lives. Tr. of Evid. Hearing at 42 (June 22, 2016). Based on this evidence, it is clear, if not "self-evident" that the Commonwealth has an interest in promoting public safety, reducing violent crime, and preventing the danger posed by firearms to innocent bystanders. *Compare Fyock*, 779 F.3d at 1000.

   b. <u>Ban on LCMs is Narrowly Tailored and Substantially Related to the Objective in Preserving Public Safety.</u>

The ban on LCMs survives intermediate scrutiny because it is substantially related to the goal of protecting public safety and is narrowly tailored to reach that result. "In considering the question of fit, [Courts] review the legislative history of the enactment as well as studies in the record or cited in pertinent case law, giving the [government] 'a reasonable opportunity to experiment with solutions to admittedly serious problems.'" *Jackson*, 746 F.3d at 966 (quoting

*City of Renton*, 475 U.S. at 52). Under intermediate scrutiny, courts must give "substantial deference to the predictive judgments of" the legislature. *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195 (1997). Courts must "remain mindful that, '[i]n the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks.'" *Cuomo*, 804 F.3d at 261–62. The court's "role . . . is only to assure [itself] that, in formulating the[] laws in question, [the legislature] ha[s] 'drawn reasonable inferences based on substantial evidence.'" *Id*. at 261–62 (quoting *Turner Broad. Sys.*, 520 U.S. at 195). As for narrow tailoring, "for purposes of intermediate scrutiny, the regulation 'need not be the least restrictive or the least intrusive means available to achieve the government's legitimate interests.'" *Vivid Entm't, LLC v. Fielding*, 774 F.3d 566, 580 (9th Cir. 2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989)).

Here, the ban on LCMs is substantially related to the goal of preserving public safety. The sources cited in the previous section provide concrete evidence of the harms that the ban on LCMs seeks to address. Studies demonstrate that banning LCM results in fewer firearms with LCMs being used in crime. S. Fallis & James V. Grimaldi, *Virginia Data Show Drop in Criminal Firepower During Assault Gun Ban*, Wash. Post (Jan. 23, 2011), http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012203452.html. In 2003, before the lapse of the federal law banning LCM, the Los Angeles Police Department recovered 38 LCMs used in connection with crime. The following year, after the lapse of the federal ban, the number rose to 1,808. Press Release, *Citizens Crime Comm'n of N.Y. City, NYC & LA City Councils Introduce Rezo for Federal Ban on Large Capacity Ammunition Magazines* (Mar. 2, 2011), http://www.nycrimecommission.org/pdfs/CrimeCmsnNYCLACouncils.pdf. Preventing access to LCM would undermine mass shooters' ability to fire as large a number of

rounds from a semi-automatic weapon. Professor Christopher Koper opined that "bans on assault weapons and large-capacity magazines, and particularly [] ban[s] on LCMs, have the potential to prevent and limit shootings in the state over the long-run." *Shew v. Malloy*, 994 F. Supp. 2d 234, 249 (D. Conn. 2014), *aff'd in part, rev'd in part sub nom. New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) (quoting Affidavit of Professor Koper). Accordingly, there is a substantial relationship between the ban on LCMs and the important government interest in protecting public safety.

**F. THE BAN ON ASSAULT RIFLES IS CONSTITUTIONAL BECAUSE INTERMEDIATE SCRUTINY APPLIES AND THE BAN ON ASSAULT RIFLES PASSES INTERMEDIATE SCRUTINY.**

The ban on assault rifles survives intermediate scrutiny because the Commonwealth has a significant, substantial, and important interest in public safety, and there is a reasonable fit between the ban on assault rifles and protecting public safety. As an initial matter, Murphy has not alleged that he seeks to possess either an "assault pistol" or "assault shotgun" as defined by SAFE. Therefore, this Court should "construe the . . . challenge to the ban on assault weapons as going only to the prohibition of certain semi-automatic rifles." *Heller II*, 670 F.3d at 1260.

*1. Intermediate Scrutiny Applies*

Intermediate scrutiny applies to the ban on "assault rifles" as defined by SAFE.

The ban on assault rifles impinges upon the right protected by the Second Amendment. First, the ban on "assault rifles" does not resemble any of the "presumptively lawful" regulations identified in *Heller I*. Second, historical evidence does not support a finding of "long standing" regulation of "assault rifles," and other courts considering the question have either not found a history of regulation justifying treating "assault rifles" as being outside the scope of the Second Amendment, or have assumed that similar bans on "assault rifles" impinge upon the right protected by the Second Amendment. *See Kolbe*, 813 F.3d at 175–78; *Cuomo*, 804 F.3d at 254–57; *Heller*

*II*, 670 F.3d 1261–62. Without further guidance from the Supreme Court or the Ninth Circuit on Second Amendment analysis, it is fair to assume, as other circuits have, that SAFE's ban on "assault weapons" impinges on Second Amendment rights. *See Cuomo*, 804 F.3d at 254–57; *Heller II*, 670 F.3d 1261–62.

The second step of Second Amendment analysis, considering (1) "how close the law comes to the core of the Second Amendment right," and (2) "the severity of the law's burden on that right" justifies the use of intermediate scrutiny. The ban on "assault rifles" concededly implicates the core right of the Second Amendment, "the right of or law-abiding, responsible citizens to use arms in defense of hearth and home." *Jackson*, 746 F.3d at 961 (quoting *Heller I*, 554 U.S. at 635). The ban on "assault rifles" limits a homeowners' choice of rifles available for self-defense. Importantly, however, the severity of SAFE's ban on "assault rifles" is not severe enough to justify strict scrutiny. First, the law does not restrict "an entire class of arms." *Cuomo*, 804 F.3d at 260. Rather, it prevents certain semi-automatic weapons with features that make them more dangerous, especially in mass shooting contexts. Furthermore, semi-automatic rifles that are .223 or less are exempted from the definition of "assault rifle." Second, the ban leaves open alternative channels of self-defense of the home. *Jackson*, 746 F.3d at 961. The ban does not affect the "quintessential self-defense weapon," the hand gun. *Heller II*, 670 F.3d at 1262. Furthermore, the ban does not affect firearms that are .223 caliber or less. 6 CMC § 10101(e)(1)(i). This means that law-abiding citizens of the Commonwealth are still allowed to use .223 AR-15 style rifles for self-defense of the home. Given that the ban on assault rifles only prohibits ownership of a subset of semiautomatic rifles and leaves individuals a wide range of alternatives firearms to use for self-defense, intermediate scrutiny is appropriate.

### 2. The Assault Rifle Ban Passes Intermediate Scrutiny

The assault rifle ban passes intermediate scrutiny because the government has an important

interest in protecting public safety and the restriction of semiautomatic rifles above .223 caliber that specified military style features is substantially related to that interest.

It is clear, if not self-evident, that protecting public safety is an important government interest. The military-style features of the banned weapons are cause for concern, especially given the number of mass shootings with assault rifles in recent years. Other circuits have credited testimony of experts such as Brian Siebel, who has testified "'the military features of semi-automatic assault weapons are designed to enhance their capacity to shoot multiple human targets very rapidly' and '[p]istol grips on assault rifles . . . help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position.'" *Heller II*, 670 F.3d at 1262–63. According to Officer Hosono developments such as the "bump stock" are able to harness the firearm's recoils to make a semi-automatic firearm fire in the same manner as an automatic. Tr. of Evid. Hearing at 24–26 (June 22, 2016). Furthermore, "assault weapons account for a larger share of guns used in mass murders and murders of police, crimes for which weapons with greater firepower would seem particularly useful." Koper, *supra*, at 51. "Assault weapons or high-capacity magazines were used in at least 14 of the incidents (15%). These incidents resulted in an average of 14.4 total people shot — 151% more people shot than in other incidents (5.7) — and 7.8 deaths — 63% more deaths than in other incidents (4.8)." Mayors Against Illegal Guns at 3. Mass shootings are an epidemic in the United States; as of time of writing, 163 mass shooting (defined as four or more shot in a single incident) have occurred leaving 236 individuals dead and 643 wounded.

The ban is substantially related to the important interest in protecting public safety because reducing the number of assault rifles available will save lives. In his study of the effects of the Federal Assault Weapons Ban, Professor Koper stated "criminal use of [assault weapons] . . . declined after" the federal assault weapons ban enacted in 1994 "independently of trends in gun crime" *Heller II*, 670 F.3d at 1263 (quoting Koper, *supra*, at 87). Importantly, in intermediate

scrutiny, courts must be mindful that "it is legislature's job, not [the judiciary's], to weigh conflicting evidence and make policy judgments." *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 99 (2d Cir. 2012). There is substantial evidence "attacks with semiautomatics – including AWs and other semiautomatics equipped with LCMs – result in more shots fired, more persons hit, and more wounds inflicted per victim than do attacks with other firearms." Koper, *supra*, at 84. Rather than banning all semiautomatics, or semiautomatic rifles, the legislature banned a subset of semiautomatic rifles above .223 caliber with enumerated military-style alterations.

### G. TAX ON HANDGUNS IS CONSTITUTIONAL BECAUSE IT IS WITHIN THE COMMONWEALTH'S POWER TO TAX, IS A REVENUE GENERATING MEASURE, IS LIMITED IN TIME, AND THERE IS A PERVASIVE HISTORICAL EVIDENCE OF LEVYING EXCISE TAXES ON FIREARMS.

The $1000 tax on pistols contained in 3 CMC § 1402(h) is constitutional because it is a legitimate use of the Commonwealth's unique ability under the Covenant to control its own customs territory. The tax is primarily revenue generating and is made for the express purpose of funding a study on the increased costs associated with the introduction of handguns into the Commonwealth. Although the tax may have an incidental deterrent effect, the Supreme Court has consistently held that this is acceptable. *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937). Furthermore, Courts do not look at the legislature's motive in passing a tax. Although there are some limitations on the power of taxation, none are implicated here.

To the extent the Court reviews the measure under the Second Amendment, which it should not, the taxation of firearms falls outside the scope of the Second Amendment because there is a long and pervasive history of the United States taxing firearms that are imported into its boarders.

### 1. Legislative Power & Control over Customs

The Commonwealth has very broad powers over legislation. Under Covenant § 206, the power of the legislature "extend[s] to all rightful subjects of legislation." "This phrase is the broadest formulation of legislative power which is possible for the Commonwealth" limited only

by the terms of the Covenant, the Constitution and laws of the United States, and the Constitution of the Commonwealth. Section by Section Analysis of the Covenant 24–25 (1975). The Covenant grants the Commonwealth taxation power over goods that are imported into the Commonwealth. Covenant § 602 grants the Commonwealth to impose taxes "as it deems appropriate." Covenant § 604(b) provides that the Commonwealth the "authority to impose excise taxes . . . upon goods imported into its territory." Importantly, as the Commerce Clause does not apply to the Commonwealth under § 501(a), the Commonwealth is not restricted in any way from levying excise taxes against goods that are imported from the several States.

As the Commonwealth has taxation powers with regards to customs far beyond those of the several States, looking to precedent involving the federal government's exercise of its taxation authority.

### 2. The Power to Tax

The power to tax is one of the most significant and far reaching powers of government. The taxation power is very broad. *See* Leo P. Martinez, *Of Fairness and Might: The Limits of Sovereign Power to Tax After* Winstar, 28 Ariz. St. L.J. 1193, 1196 (1996). "A tax is not any the less a tax because it has a regulatory effect, and it has long been established that an Act of Congress which on its face purports to be an exercise of the taxing power is not any the less so because the tax is burdensome or tends to restrict or suppress the thing taxed." *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2596 (2012). This is true even when the tax implicates rights under the U.S. Constitution, though this statement is qualified below. *Sonzinsky*, 300 U.S. 506 (taxation of firearms); *United States v. Lee*, 445 U.S. 252 (1982) (freedom of religion).

Courts are generally limited in their ability to strike down taxes. The primary question for the Court is whether revenue generation is the main purpose of the tax. As will be shown in the

next paragraph, "[a] tax cannot bar an activity, but the Supreme Court has upheld taxes that discourage an activity or make it difficult or expensive." Martinez, *Of Fairness*, *supra*, at 1201 (1996) (citing *Sonzinsky*, 300 U.S. 506). "The amount of a tax is apparently not a factor the Court focuses on, even if the excessive amount demonstrates a deterrent purpose." *Id*. at 1202. Indeed:

> [T]he Court has expressed the idea that even a tax with a particularly steep rate or an "obvious deterrent purpose" does not necessarily evince an inappropriate use of the power to tax. So long as revenue generation can be labeled as the main purpose for the tax, the Court likely will disregard the high rate and the deterrent effect.

*Id*. (citing *Dep't of Revenue of Montana v. Kurth Ranch*, 511 U.S. 778, 780 (1994)). Furthermore, there is a longstanding general rule is that "[i]nquiry into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it is beyond the competency of courts." *Sonzinsky*, 300 U.S. at 513–14; *Fernandez v. Wiener*, 326 U.S. 340, 362 (1945). Further, Courts "will not undertake, by collateral inquiry as to the measure of the regulatory effect of a tax, to ascribe to Congress an attempt, under the guise of taxation, to exercise another power denied by the Federal Constitution." *Sonzinsky*, 300 U.S. at 514. This statement of the law is in no way intended to imply that the power to tax is unlimited. Indeed, while the amount of the tax alone cannot shatter the presumption of validity "even though there has been ground for suspecting, from the weight of the tax" that there is an improper purpose, there is not deference when it is evident from the face of the statute in question that the goal is an impermissible purpose. *Child Labor Tax Case*, 259 U.S. 20, 38 (1922) (facial purpose was to regulate labor, a power reserved to the states); *see also Minn. Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 581 (1983).

There are important limitations on the power to enact a tax. A tax may not have an exclusively deterrent purpose; it must be tied to revenue generation. Martinez, *Of Fairness*, *supra*, at 1201–02; *Sonzinsky*, 300 U.S. 506. A tax may not be used to inflict punishment or assess criminal penalties, such as a tax on illegal drugs that is only imposed on criminals. *Kurth Ranch*, 511 U.S. at 779; Martinez, *Of Fairness*, *supra*, at 1204–05. "A tax subsequent to and in addition

to criminal penalties is inappropriate if its purpose 'may not fairly be characterized as remedial, but only as a deterrent or retribution.'" Martinez, *Of Fairness*, *supra*, at n.69 (quoting *United States v. Halper*, 490 U.S. 435, 448-49 (1989)); *see also Kurth Ranch*, 511 U.S. at 79 (O'Connor, J., dissenting); *Child Labor Tax Case*, 259 U.S. at 34 (U.S. 1922). A tax may also not be used to treat individuals or groups of individuals in a harsh and oppressive manner, *United States v. Carlton*, 512 U.S. 26, 30 (1994), though commenters have noted that challenges based on this provision have not been successful, despite the apparent strengths of many objections. Tracy A. Kaye & Stephen W. Mazza, *United States-National Report: Constitutional Limitations on the Legislative Power to Tax in the United States*, 15 Mich. St. J. Int'l L. 481 (2007); Martinez, *Of Fairness*, s*upra*, at 1207–11; Leo P. Martinez, *"To Lay and Collect Taxes": The Constitutional Case for Progressive Taxation*, 18 Yale L. & Pol'y Rev. 111, 114 (1999).

Most importantly, a tax that on its face singles out a constitutionally protected group for differential treatment rights is suspect. A tax that a separate constitutionally protected group must withstand constitutional scrutiny. The polestar for this proposition is *Minn. Star*, 460 U.S. 575. In *Minn. Star*, the State of Minnesota imposed a tax on ink and paper used exclusively in publications such as newspapers. *Id*. at 578. At the same time, the statute exempted the first $100,000. *Id*. "After the enactment of the $100,000 exemption, 11 publishers, producing 14 of the 388 paid circulation newspapers in the State, incurred a tax liability." *Id*. The Plaintiff, one of the newspapers taxed, sued alleging a violation of freedom of press. The Court held that the taxation scheme targeted the press, and that "[a] tax that burdens rights protected by the First Amendment cannot stand unless the burden is necessary to achieve an overriding governmental interest." *Id*. at 582. The Court cited *Lee* as an example of where the social security tax was constitutional, despite the fact that it infringed on the religious beliefs of the Amish, as an example where an overriding interest qualified. *Id*. (citing *Lee*, 455 U.S. 252). The Court reasoned "differential treatment, unless

justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional." *Id* at 585. The Court reasoned that the State could have taxed all businesses in the same manner. The Court next held that the justification of raising revenue, "standing alone," could not justify the tax in question. *Id*. at 587. Finally, the Court held the differential treatment of the 11 affected newspapers violated the First Amendment, reasoning" when the exemption selects such a narrowly defined group to bear the full burden of the tax, the tax begins to resemble more a penalty for a few of the largest newspapers than an attempt to favor struggling smaller enterprises." *Id*. at 592.

### 3. Taxation of Firearms by the Federal Government

The extent to which *Minn. Star* will impact the challenged tax is unclear because of the differences between the First and Second Amendments. Scholars examining the issue have pointed to the differences in the way taxation affects First and Second Amendment Rights. *See, e.g.*, Rangappa, *supra*, at 20; Philip J. Cook et al., *Gun Control After Heller: Threats and Sideshows from A Social Welfare Perspective*, 56 UCLA L. Rev. 1041, 1083–1088 (2009). The Commonwealth will address the distinctions in the next section.

Important to the Second Amendment analysis, the United States has a history of taxing the sale of firearms by manufacturers, producers, and importers. The United States currently levies an excise tax on sale of fire arms. 26 U.S. § 4281. The current scheme taxes the sale of firearms by those groups. 26 U.S.C. § 4281. The tax involves differential treatment of firearms: handguns are taxed at 10% of the sale price, all other firearms are taxed at 11% of the sale price. 26 U.S.C. § 4281. The United States has taxed firearms since at least 1919. Revenue Act of 1918, Pub. L. No. 254, §900(10). The Revenue Act of 1918 taxed all firearms, other than those sold to the federal, state, or local governments.[7] In 1934, Congress taxed the sale of every firearm at $200 per firearm.

---

[7] The Commonwealth is still locating data on the price of firearms in 1919, and will address

National Firearms Act of June 26, 1934, c. 757, 48 Stat. 1236; *Sonzinsky*, 300 U.S. at 511. Accounting for inflation's effect on purchasing power, $200.00 in 1934 had the same purchasing power as $3,585.61 today. Bureau of Labor Stats., CPI Inflation Calculator, http://www.bls.gov/data/inflation_calculator.htm.

4. *Application*

The $1,000.00 tax on firearms in 3 CMC § 1402(h) is a constitutional exercise of the Commonwealth's taxations power. The Commonwealth has the power to tax, and has significant power to levy excise taxes. The tax is legitimate because the primary goal of the tax is to generate revenue to deal with the costs associated with the introduction of handguns. Specifically, the tax is meant to provide interim funding to the agencies that will be most affected by the introduction of handguns, and to update government buildings with security systems such as metal detectors. PL 19-42, § 15. The measure is an interim tax; at the latest it will expire on April 11, 2017. *Id.* Currently, the Governor is commissioning a study to find the cost of updating the Commonwealth government's infrastructure to deal with the threat of increased handgun violence, and legislation must be imposed at least 60 days before the tax expires. *Id.*

The tax is distinguishable from the tax is *Minn. Star*. There, the tax as issue was designed to specifically target 11 out of 388 publishers statewide. Here, the tax applies equally to all actors, commercial and noncommercial.

As for Second Amendment analysis, the tax does not impinge on the Second Amendment because, although not one of the presumptively lawful regulations in *Heller*, there is a pervasive history of taxing firearms. Following *Heller I*, the Ninth Circuit fist looks at whether the challenged measure fits within "historical understanding of the Second Amendment right." *Jackson*, 746 F.3d

_____

the subject in the Opposition to the Cross Motion for Summary Judgment filed by Murphy. The Commonwealth may need to pay to access archives of major retailers at the time.

at 960. The United States has taxed firearms since at least 1919, and the National Firearms Act of 1934 imposed a tax in an amount that would equal over $3,500 in 2016. As there is historical evidence of pervasive regulation of the kind at issue here, taxation of firearms falls outside the historic scope of the Second Amendment, and the analysis ends; under current analysis historical evidence has the final say.[8] *Id*.

## V.     CONCLUSION

The Commonwealth is entitled to summary judgment on all counts.


RESPECTFULLY SUBMITTED.

OFFICE OF THE ATTORNEY GENERAL

DATED: June 30, 2016

*/s/ Charles E. Brasington*
Charles E. Brasington
Assistant Attorney General
Attorney for Defendants

---

[8]   There is good reason for all parties to the Second Amendment debate to criticize giving so much weight to the historical record, see *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015), but it remains the law of the Ninth Circuit.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing has been electronically filed this 30th day of June 2016. Further, I certify that a true and correct copy of the foregoing motion was served by electronic mail at paul.murphy.officialmail@gmail.com.

/s/ *Charles E. Brasington*
Charles E. Brasington
Assistant Attorney General
Attorney for Defendants