OFFICE OF THE ATTORNEY GENERAL
Edward Manibusan
Attorney General
Charles E. Brasington
Assistant Attorney General
Hon Juan A. Sablan Mem. Bldg., 2nd Floor
Saipan, MP 96950-8907
Tel: (670) 237-7500
Fax: (670) 664-2349
e-mail: charles_brasington@cnmioag.org
Attorney for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN MARIANA ISLANDS

PAUL MURPHY,

      Plaintiff,

  v.

ROBERT A. GUERRERO, in his official
capacity as Commissioner of the Department
of Public Safety of the Commonwealth of
the Northern Mariana Islands, and LARISSA
LARSON, in her official capacity as
Secretary of the Department of Finance of
the Commonwealth of the Northern Mariana
Islands,

      Defendants.

Civil Action No. 14-0026

**OPPOSITION TO PLAINTIFF'S
CROSS MOTION FOR SUMMARY
JUDGMENT**

**Date: July 28, 2016**

**Time: 1:30**

**Judge: Ramona V. Manglona, C.J.**

TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................... 1

II.  STATEMENT OF UNDISPUTED FACTS ............................................................. 1

III. ARGUMENT ................................................................................................................... 1

A. HISTORY & SECOND AMENDMENT ANALYSIS ............................................. 1

B. INTERMEDIATE SCRUTINY ........................................................................................ 3

C. THE REGISTRATION REQUIREMENTS ARE CONSTITUTIONAL ........................................... 4

   1. The basic registration requirement as to handguns is presumptively
      lawful ................................................................................................................... 5

      a. State & territorial registration and licensing schemes are common ................ 6

   2. Assuming that the basic registration requirement impinges on the Second
      Amendment, intermediate scrutiny applies and the Commonwealth's
      registration scheme passes intermediate scrutiny. ................................................ 7

      a. Intermediate scrutiny applies ........................................................................ 7

      b. Registration requirement passes intermediate scrutiny.............................. 7

   3. 4 CMC § 1402 passes intermediate scrutiny ...................................................... 10

D. STORAGE PROVISIONS OF SAFE ARE CONSTITUTIONAL ................................................. 11

   1. 6 CMC § 10204 ..................................................................................................... 11

   2. Challenge to 6 CMC § 10206 is not a challenge to the Commonwealth's lack
      of a carry regime. ................................................................................................. 13

E. INTERMEDIATE SCRUTINY APPLIES TO THE RESTRICTIONS ON LARGE CAPACITY
   AMMUNITION FEEDING DEVICES AND ASSAULT RIFLES, AND BOTH REGULATIONS
   SURVIVE INTERMEDIATE SCRUTINY .......................................................................... 14

   1. Restricting LCMs does not render Murphy's firearms inoperable. ..................... 14

   2. Reviewing U.S. Courts of Appeals' case law indicates intermediate scrutiny is
      appropriate to the restrictions on large capacity ammunition feeding devices
      and assault weapons. ........................................................................................... 15

      a. Intermediate Scrutiny (*Heller II, Fyock, Cuomo*) ........................................ 15

      b. Strict Scrutiny (*Kolbe*) ................................................................................. 18

      c. SAFE's Provisions.......................................................................................... 19

F. F. THE TAXATION ON HANDGUNS IS CONSTITUTIONAL ................................................. 20

   1. The tax is a legitimate use of the taxation power................................................. 21

      a. The tax's primary purpose is revenue generation........................................... 21

      b. The tax is not one of the types of prohibited taxes ........................................ 22

   2. Longstanding History of Taxation of Firearms .................................................... 24

IV.  CONCLUSION............................................................................................................... 25

## Cases

*Brown v. Entm't Merchants Ass'n,*
    564 U.S. 786 (2011) ....................................................................................... 1

*Child Labor Tax Case,*
    259 U.S. 20 (1922) ................................................................................... 20, 23

*City of Renton v. Playtime Theatres, Inc.,*
    475 U.S. 41 (1986) ..................................................................................... 4, 12

*City of Los Angeles v. Alameda Books, Inc.,*
    535 U.S. 425 (2002) ....................................................................................... 3

*Dep't of Revenue of Montana v. Kurth Ranch,*
    511 U.S. 778 (1994) ................................................................................. 21–23

*District of Columbia v. Heller (Heller I),*
    554 U.S. 603 (2008) .............................................................. 1–2, 11–12, 25

*Ezell v. Chicago,*
    651 F.3d 684 (7th Cir. 2011) ...................................................................... 2

*Friedman v. City of Highland Park, Ill.,*
    784 F.3d 406 (7th Cir. 2015) .................................................................... 15

*Fyock v. Sunnyvale,*
    779 F.3d 991 (9th Cir. 2015) ......................................................... 4, 15–17

*Heller v. District of Columbia (Heller II),*
    670 F.3d 1244 (D.C. Cir. 2011) ................. 2, 5–7, 10, 15–17, 19–20, 24

*Heller v. District of Columbia (Heller III),*
    801 F.3d 264 (D.C. Cir. 2015) ................................................................. 5, 6

*Jackson v. City & Cnty. of San Francisco,*
    746 F.3d 953 (2015) ..................................................................... 1–3, 12, 19

*Justice v. Town of Cicero,*
    577 F.3d 768 (7th Cir. 2009) ...................................................................... 6

*Kachalsky v. Cty. of Westchester,*
    701 F.3d 81 (2d Cir. 2012) ......................................................................... 4

*Kolbe v. Hogan,*
    813 F.3d 160 (4th Cir. 2016) ....................................................... 14–15, 18–19

*McDonald v. Chicago,*
    561 U.S. 742 (2010) ....................................................................................... 1

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue,*
    460 U.S. 575 (1983) ............................................................. 21, 23–24

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    132 S. Ct. 2566 (2012) ............................................................. 23

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015) ............................................. 3, 15, 17–19

*Peruta v. Cty. of San Diego,*
    No. 10-56971, 2016 WL 3194315 (9th Cir. June 9, 2016) .................... 1, 2

*Radich v. Deleon Guerrero,*
    Civ. No. 14-0020 ................................................................... 5, 25

*Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n (Turner I),*
    512 U.S. 622 (1994) ................................................................ 4

*Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n (Turner II),*
    520 U.S. 180 (1997) ................................................................ 3

*Sonzinsky v. United States,*
    300 U.S. 513 (1937) ....................................................... 22, 24–25

*United States v. Chovan,*
    735 F.3d 1127 (9th Cir. 2013) ............................................ 1–3, 8

*United States v. Masciandaro,*
    638 F.3d 458 (4th Cir. 2011) ................................................... 19

*Young v. Am. Mini Theatres, Inc.,*
    427 U.S. 50 (1976) ................................................................. 4

*Vivid Entm't, LLC v. Fielding,*
    774 F.3d 566 (9th Cir. 2014) .................................................... 4

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ............................................................ 4, 14

## **Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, 48 U.S.C. § 1801 note**

Covenant § 501(a) ...................................................................... 21

Covenant § 604(b) ...................................................................... 21

# Statutes

18 U.S.C. § 922(g) ........................................................................................................ 9

26 U.S.C. § 4181 ..................................................................................................... 24–25

48 U.S.C. § 1801 note ................................................................................................ 21

3 CMC § 1402(h) .................................................................................................... 20–25

4 CMC § 1407(b) .................................................................................................... 10–11

6 CMC § 2204(a) ........................................................................................................ 8

6 CMC § 2204(f) ........................................................................................................ 9

6 CMC § 10101(e)(1)(i) ......................................................................................... 16, 18

6 CMC § 10204 .......................................................................................................... 11

6 CMC § 10204(a)(2) ................................................................................................. 12

6 CMC § 10206 ................................................................................................... 11, 13

6 CMC § 10207(b) ..................................................................................................... 16

6 CMC § 10208(a)(5) ................................................................................................ 16

10 G.C.A. § 60110 ...................................................................................................... 6

25 L.P.R.A. § 456k ..................................................................................................... 6

23 V.I.C. § 473 ........................................................................................................... 6

Cal. Penal Code § 16370 ............................................................................................ 6

Cal. Penal Code § 16670 ............................................................................................ 6

Cal. Penal Code §§ 26840–26859 .............................................................................. 6

Cal. Penal Code §§ 30510–30530 .............................................................................. 6

Cal. Penal Code §§ 30600–30675 .............................................................................. 6

Cal. Penal Code §§ 30900–30965 .............................................................................. 6

Cal. Penal Code §§ 31610–31700 .............................................................................. 6

Conn. Gen. Stat. § 29-33 ........................................................................... 6

Conn. Gen. Stat. §§ 29-36f to 29-36i ....................................................... 6

Conn. Gen. Stat. § 29-37a ......................................................................... 6

Conn. Gen. Stat. §§ 29-38g to 29-38j ....................................................... 6

Conn. Gen. Stat. § 53-202d(a) .................................................................. 6

Conn. Gen. Stat. § 53-202p(a)(1) .............................................................. 6

Conn. Gen. Stat. § 53-202q ...................................................................... 6

D.C. Code Ann. §§ 7-2502.01 to 7-2502.10 ............................................ 6

D.C. Code Ann. § 7-2501.01(3A)(i)(IV) ................................................ 16

D.C. Code Ann. § 7-2502.2(6) ................................................................ 16

D.C. Code Ann. § 7-2506.01(b) .............................................................. 16

Haw. Rev. Stat. Ann. § 134-2 .................................................................. 6

Haw. Rev. Stat. Ann. § 134-3 .................................................................. 6

Haw. Rev. Stat. Ann. § 134-4 .................................................................. 6

Haw. Rev. Stat. Ann. § 134-13 ................................................................ 6

Iowa Code §§ 724.15 – 724.20 ................................................................ 7

430 Ill. Comp. Stat. 65/1 – 65/15a ......................................................... 7

Md. Code Ann., Crim. Law § 4-303 ........................................................ 6

Md. Code Ann. Pub. Safety § 5-117.1 ..................................................... 7

Mass. Gen. Laws ch. 140, § 121 .............................................................. 7

Mass. Gen. Laws ch. 140, § 129B ............................................................ 7

Mass. Gen. Laws ch. 140, § 129C ............................................................ 7

Mass. Gen. Laws ch. 140, §131 ............................................................... 7

Mass. Gen. Laws ch. 140, § 131A ........................................................... 7

Mass. Gen. Laws ch. 140, § 131E ............................................................ 7

Mass. Gen. Laws ch. 140, § 131P ............................................................................. 7

Mich. Comp. Laws § 28.422 ................................................................................... 7

Mich. Comp. Laws § 28.422a .................................................................................. 7

Neb. Rev. Stat. Ann. § 69-2404 .............................................................................. 7

Neb. Rev. Stat. Ann. § 69-2407 .............................................................................. 7

Neb. Rev. Stat. Ann. § 69-2409 .............................................................................. 7

N.J. Stat. Ann. § 2C:39-5f ...................................................................................... 6

N.J. Stat. Ann. § 2C:39-5f ...................................................................................... 6

N.J. Stat. Ann. § 2C:58-3 ........................................................................................ 7

N.Y. Penal Law §§ 265.00(22)(e)–(f) ..................................................................... 6

N.Y. Penal Law § 265.00(23) .................................................................................. 6

N.Y. Penal Law § 400.00(10) .................................................................................. 6

N.Y. Penal Law § 400.00(16-a) ............................................................................... 6

N.Y. Penal Law § 400.02 ......................................................................................... 6

N.Y. Penal Law §§ 400.00–400.01 ......................................................................... 7

N.C. Gen. Stat. §§ 14-402 to 14-404 ...................................................................... 7

R. I. Gen. Laws §§ 11-47-35 to 11-47-35.1 ............................................................ 7

## Public Laws

Revenue Act of 1918, Pub. L. No. 254, § 900(10) ..................................................... 24

P.L. 19-42 ................................................................................................................ 12, 20, 22

## Secondary Sources

*Ambler boy, 8, dies after being accidentally shot by another child*,
   Alaska Dispatch News, June 1, 2015, http://www.adn.com/rural-alaska/article/
   ambler-boy-8-dies-after-being-accidentally-shot-another-child/2015/06/02/ ........................ 13

*Bushmaster Factory Direct Replacement Magazine*, Gander Mountain,
  http://www.gandermountain.com/modperl/product/details.cgi?pdesc=Bushmaster-Factory-
  Direct-AR-15-Replacement-10-Round-Magazine&i=706935 ........................................ 14–15

CK Crifasi et al., *Effects of Changes in Permit-to-Purchase Handgun Laws in Connecticut and
  Missouri on Suicide Rates*, 79 Preventative Medicine 43 (2015) ........................................ 8–9

*Girl, 9, wounded in accidental discharge of assault rifle in St. Louis County*, St. Louis Post
  Dispatch, June 6, 2016, http://www.stltoday.com/news/local/crime-and-courts/
  girl-wounded-in-accidental-discharge-of-assault-rifle/article_cbb94fa3-be23-5d6c-
  ab4b-3a3a2db8adbe.html ...................................................................................................... 13

*GLOCK Factory G19 Magazine. 10 Rounds*, Glockmeister,
  http://www.glockmeister.com/GLOCK-FactoryG19Magazine10Rounds/
  productinfo/G19MAG/ ........................................................................................................ 15

*How to Convert a 30-Round Magpul PMAG M3 AR-15 Magazine for Legal California Use*,
  Instructables.com, http://www.instructables.com/id/How-to-Convert-a-30-Round-PMAG-
  M3-AR-15-Magazine-f/ (last accessed July 12, 2016) ........................................................ 15

C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*,
  32 Harv. J.L. & Pub. Pol'y 695 (2009) .................................................................................. 2

KE Rudolph et al., *Association Between Connecticut's Permit-to-Purchase Handgun Law and
  Homicides*, 105 Am. J. Pub. Health 49 (2015) .................................................................... 8–9

Daniel Wester et al., *Effects of the Repeal of Missouri's Handgun Purchaser Licensing Law on
  Homicides*, 91 J. Urban Health 293 (2014) ........................................................................ 8–9

Daniel Wester et al., *Erratum to: Effects of the Repeal of Missouri's Handgun Purchaser
  Licensing Law on Homicides*, 91 J. Urban Health 598 (2014) ........................................... 8–9

## I.    INTRODUCTION

The Commonwealth[1] hereby opposes Plaintiff Paul Murphy's Cross Motion for Summary Judgment, ECF No. 97.

## II.    STATEMENT OF UNDISPUTED FACTS

The Commonwealth relies on its statement of undisputed facts in its Cross Motion for Summary Judgment, ECF No. 98.

## III.    ARGUMENT

### A.    HISTORY & SECOND AMENDMENT ANALYSIS

The Commonwealth has already explained Second Amendment analysis in its Cross Motion for summary judgment, but a brief summary is useful. Courts first look to see whether the challenged law or regulation "'burdens conduct protected by the Second Amendment' based on a 'historical understanding of the scope of the [Second Amendment] right,' or whether the challenged law falls within a 'well-defined and narrowly limited' category of prohibitions 'that have been historically unprotected.'" *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 2799, 192 L. Ed. 2d 865 (2015) (quoting *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 791–92 (2011)); *District of Columbia v. Heller (Heller I)*, 554 U.S. 570, 625 (2008); *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013). If a review of history demonstrates that the type of regulation has been "longstanding," then the regulation is "presumptively lawful" and the inquiry ends. *See Peruta v. Cty. of San Diego*, No. 10-56971, 2016 WL 3194315, at *6 (9th Cir. June 9, 2016) (demonstrating that "[i]n analyzing the meaning of the Second Amendment, the Supreme Court in *Heller* and *McDonald* treated its historical analysis as determinative.")

Exactly how long a regulation must exist is not clear. Some Courts have found that the

---

[1] Defendants are referred to in this Memorandum as "the Commonwealth."

regulation must have a pedigree extending to "1791 or 1868" to be presumptively lawful. *Ezell v. Chicago*, 651 F.3d 684, 703 (7th Cir. 2011). However, more recent statutes have been found to be "longstanding." In *Heller I*, the Supreme Court identified the prohibition on the ownership of firearms by felons as an example of a "longstanding," and hence "presumptively lawful" measure, despite the fact that laws prohibiting felons from owning firearms were not enacted until the early 20th Century. 554 U.S. at 627; *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) (quoting C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009)). The U.S. Court of Appeals for the District of Columbia has found laws requiring the registration of pistols that were first enacted in 1911 qualify as "longstanding" and "presumptively lawful." *Heller II*, 670 F.3d at 1254. However, the Ninth Circuit recently looked back all the way to 1299 in determining that the scope of the Second Amendment's protection did not extend to carrying a concealed weapon in public. *Peruta*, 2016 WL 3194315 at *6. What is clear, however, is that history is determinative: if the government can show that a challenged regulation has enough of a historical pedigree to be "longstanding," then the analysis ends there.

If a law does implicate a right historically understood to be within the scope of protection of the Second Amendment, the court considers the proper level of scrutiny. The Ninth Circuit considers two factors. The first consideration is "how close the law comes to the core of the Second Amendment right," *i.e.*, lawful self-defense, especially of the home. *Jackson*, 746 F.3d at 960–61. The second consideration is "the severity of the law's burden on" the core right of self-defense. *Id.* at 961. Synthesizing these two consideration demonstrates that the more severe the restriction on the core right of self-defense, especially the right to lawfully defend one's home, the higher the level of scrutiny. Importantly, however, when considering the severity of a law's burden, courts recognize that laws restricting the *manner* in which an individual exercises self-defense are less

burdensome than laws that completely ban the possession of firearms. *Id*. "Similarly, firearm regulations which leave open alternative channels for self-defense are less likely to place a severe burden on the Second Amendment right than those which do not." *Id*.

## B. INTERMEDIATE SCRUTINY

A brief description of intermediate scrutiny is warranted in this case. Although various terms have been used to describe intermediate scrutiny, "all forms of the standard require (1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." *Jackson*, 746 F.3d at 965 (quoting *Chovan*, 735 F.3d at 1139). In applying intermediate scrutiny, courts accord the legislature substantial deference. For instance, when considering the asserted purpose, courts "do not impose 'an unnecessarily rigid burden of proof . . . so long as whatever evidence the [legislature] relies upon is reasonably believed to be relevant to the problem that the city addresses.'" *Id*. Furthermore, the U.S. Court of Appeals for the Ninth Circuit has found that "public safety is an important government interest." *Id*..

In determining whether an interest is substantially related to the stated interest, courts "afford 'substantial deference to the predictive judgments of the legislature.'" *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015), *cert. denied sub nom. Shew v. Malloy*, No. 15-1030, 2016 WL 632684 (U.S. June 20, 2016) (quoting *Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n (Turner II)*, 520 U.S. 180, 195 (1997)). Importantly, intermediate scrutiny does not require a *perfect* fit between the challenged law and the government interests— it only requires a *substantial* fit. When a law is subject to intermediate scrutiny, the government has the burden to produce evidence that "fairly supports" its rational for the challenged law. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002) (plurality opinion). In considering evidence, courts recognize that a legislature is "entitled to rely on any evidence 'reasonably

believed to be relevant' to substantiate its important interests." *Fyock v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015) (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)). Courts recognize that "the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers [relating to] firearms and the manner to combat those risks." *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) (quoting *Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n (Turner I)*, 512 U.S. 622, 665 (1994)). Ultimately, the court's role is to determine whether the legislature "has drawn reasonable inferences based on substantial evidence." *Turner I*, 512 U.S. at 666.

Finally, while intermediate scrutiny involves some degree of tailoring, "for purposes of intermediate scrutiny, the regulation 'need not be the least restrictive or the least intrusive means available to achieve the government's legitimate interests.'" *Vivid Entm't, LLC v. Fielding*, 774 F.3d 566, 580 (9th Cir. 2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989)). Indeed, the Supreme Court has recognized that legislatures "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *City of Renton*, 475 U.S. at 52 (quoting *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 71 (1976)).

## C.  THE REGISTRATION REQUIREMENTS ARE CONSTITUTIONAL.

The Court should construe Murphy's challenge to the registration requirements as a challenge to the basic registration requirement, rather than to each and every aspect of the Weapon Control Act's (the Act) registration provisions. The issue is standing. Murphy's Fourth Amended Complaint, ECF No. 86, Memorandum in Support of Fourth Amended Complaint for Declaratory and Injunctive Relief, ECF No. 87, and Motion for Summary Judgment, ECF No. 97, make clear that he is challenging the basic registration requirement. The argument is that the basic registration requirement violates the Second Amendment, not that certain aspects, such as the requirement that

Weapons Identification Cards (WIC) be renewed, violate the Second Amendment.[2] That Murphy's argument is aimed at the basic registration requirement alone is further demonstrated by his conduct. Murphy has allowed his WIC to lapse and has not taken any steps to renew it. Decl. of Elma Tenorio; Pl's. List of Exs., Ex. 5, ECF No. 47-6. Murphy's grievance would not be remedied by striking any portion of the registration scheme; Murphy's grievance would only be remedied by a holding that the Commonwealth (and by extension the several States and federal government) cannot require the registration of firearms.[3] If Murphy wishes to challenge individual provisions of the Act, he should file a complaint identifying the specific portions of the Act that he challenges.

1.  *The basic registration requirement as to handguns is presumptively lawful.*

The basic requirement that firearms be registered is presumptively lawful. The registration of handguns because there is a pervasive history of requiring handguns to be registered. In *Heller II*, 670 F.3d 1244, and *Heller v. District of Columbia (Heller III)*, 801 F.3d 264 (D.C. Cir. 2015), the U.S. Court of Appeals for the District of Columbia considered the history of firearm registration in the United States. *Heller II* found that there was a pervasive history, stretching back

---

[2] The WICs required by the Weapons Control Act are distinguishable from those in *Heller v. District of Columbia (Heller III)*, 801 F.3d 264 (D.C. Cir. 2015). *Heller III* involved registering a firearm *Heller III*, 801 F.3d at 277. The *Heller III* court found that a scheme requiring the reregistration of firearms every 3 years did not pass intermediate scrutiny where registrants were (constitutionally) subjected to vigorous reporting requirements. *Id.* at 277–78. The WIC is more of a hybrid license and registration card and the reporting requirements under the remaining portions of the Weapons Control Act are not as strenuous as those constitutionally imposed by D.C. law. Furthermore, the Office of the Attorney General has already submitted proposed legislation to repeal the remaining Weapons Control Act and replace it with a more modern scheme that is less burdensome on DPS and firearm owners and removes the re-registration requirement for firearms.

[3] Murphy's argument that registration schemes are constitutional in areas that have experienced race riots or other violent upheavals has no support in any case law or other relevant authority. To the contrary, Second Amendment analysis is generally not jurisdiction specific. *See, e.g.*, *Radich v. Deleon Guerrero*, No. 1:14-CV-00020, 2016 WL 1212437, at *6, *7 (D. N. Mar. I. Mar. 28, 2016) (rejecting arguments that relied on the Commonwealth's individual history).

to the early 20th Century, of laws requiring the registration of handguns, and as such laws requiring the registration of handguns were "longstanding" and "presumptively lawful." 670 F.3d at 1253–54. The court further found that the basic registration requirements were "self-evidently de minimis, for they are similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous." *Id.* at 1254–55. After remand and subsequent appeal, the *Heller III* court found that the plaintiff failed to introduce any evidence that would show the requirement that long guns be registered was more than a de minimus burden. 801 F.3d at 273. Because the registration of long guns only imposed a de minimus burden, the *Heller III* court held that requiring registration of long guns "does not implicate the second amendment [sic] right." *Id.* at 274 (citing *Justice v. Town of Cicero*, 577 F.3d 768, 773–75 (7th Cir. 2009)).

      a.   <u>State & territorial registration and licensing schemes are common.</u>

Registration and licensing schemes are not as uncommon as Murphy argues. There are generally two types of schemes: (1) registration of firearms and (2) licensure of individuals to purchase or possess firearms. Registration schemes are found in California, Cal. Penal Code §§ 30510–30530, 30600–30675, 30900–30965, Connecticut, Conn. Gen. Stat. §§ 53-202d(a), 53-202p(a)(1), 53-202q, the District of Columbia, D.C. Code Ann. §§ 7-2502.01 to 7-2502.10, Guam, 10 G.C.A. § 60110, Hawaii, Haw. Rev. Stat. Ann. §§ 134-3, 134-4, Maryland, Md. Code Ann., Crim. Law § 4-303, New Jersey, N.J. Stat. Ann. §§ 2C:39-5f, 2C:58-12, New York, N.Y. Penal Law §§ 265.00(22)(e)–(f), 265.00(23), 400.00(10), 400.00(16-a), 400.02, Puerto Rico, 25 L.P.R.A. § 456k, and the U.S. Virgin Islands, 23 V.I.C. § 473. Licensing schemes are found in California, Cal. Penal Code §§ 16370, 16670, 26840–26859, 31610–31700, Connecticut, Conn. Gen. Stat. §§ 29-33, 29-36f to 29-36i, 29-37a, 29-38g to 29-38j, the District of Columbia, D.C. Code Ann. §§ 7-2502.01 to 7-2502.10, Hawaii, Haw. Rev. Stat. Ann. §§ 134-2, 134-13, Iowa,

Iowa Code §§ 724.15–724.20, Illinois, 430 Ill. Comp. Stat. 65/1–65/15a, Maryland, Md. Code Ann. Pub. Safety § 5-117.1, Massachusetts, Mass. Gen. Laws ch. 140, §§ 121, 129B, 129C, 131, 131A, 131E, 131P, Michigan, Mich. Comp. Laws §§ 28.422, 28.422a, Nebraska, Neb. Rev. Stat. Ann. §§ 69-2404, 69-2407, 69-2409, New Jersey, N.J. Stat. Ann. § 2C:58-3, New York, N.Y. Penal Law §§ 400.00–400.01, North Carolina, N.C. Gen. Stat. §§ 14-402 to 14-404, Puerto Rico, 25 L.P.R.A. § 456a, and Rhode Island, R. I. Gen. Laws §§ 11-47-35 to 11-47-35.1.

> 2. *Assuming that the basic registration requirement impinges on the Second Amendment, intermediate scrutiny applies and the Commonwealth's registration scheme passes intermediate scrutiny.*

To ensure full briefing of the subject, the Commonwealth will provide analysis demonstrating that, should the Court find that the basic registration requirement impinges upon the Second Amendment, intermediate scrutiny applies. This argument is made in the alternative.

### a. Intermediate scrutiny applies

Assuming the basic registration requirement impinges on the Second Amendment right, intermediate scrutiny applies because the burden is not severe. The requirement that an individual obtain a license and register each firearm before taking possession of the firearm may burden the Second Amendment right by requiring the owner to take affirmative steps to obtain a license and register his or her firearm before taking possession of it. *Heller II*, 670 F.3d at 1256 (discussing registration requirements beyond the basic registration requirement). However, such a burden is not severe enough to warrant strict scrutiny. *Id*. at 1258. While the burden *delays* a qualified individual from possessing a firearm, it does not *prevent* the individual from possessing a firearm once the licensing and registration process is completed. *Id*. Therefore, intermediate scrutiny is appropriate.

### b. Registration requirement passes intermediate scrutiny

The basic registration requirement passes intermediate scrutiny because the

Commonwealth has an important interest in preventing individuals prohibited from possessing firearms from acquiring them, and the basic registration requirement is substantially related to that interest. The registration requirement and licensing requirement serve the important government interest in protecting public safety by keeping firearms away from individuals that are barred from purchasing firearms under federal and Commonwealth law. The registration and licensing requirement substantially advances this interest by preventing individuals barred from possessing firearms from acquiring them through legal channels. Studies of States with and without licensing laws demonstrate that registration and licensing laws have a significant impact on reducing gun crime. KE Rudolph et al., *Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides*, 105 Am. J. Pub. Health 49 (2015); CK Crifasi et al., *Effects of Changes in Permit-to-Purchase Handgun Laws in Connecticut and Missouri on Suicide Rates*, 79 Preventative Medicine 43 (2015); Daniel Wester et al., *Effects of the Repeal of Missouri's Handgun Purchaser Licensing Law on Homicides*, 91 J. Urban Health 293 (2014); Daniel Wester et al., *Erratum to: Effects of the Repeal of Missouri's Handgun Purchaser Licensing Law on Homicides*, 91 J. Urban Health 598 (2014). The registration and licensing requirement is narrowly tailored because it only requires an applicant to submit evidence that he or she is not prohibited from possessing a firearm under Commonwealth or federal law.

The registration requirement serves the interest of public safety by "keeping firearms away from those most likely to misuse them." *Chovan*, 735 F.3d at 1139. The Weapons Control Act requires an individual wishing to possess a firearm to apply for a WIC. 6 CMC § 2204(a). An individual will be not be eligible for a WIC if he or she has been:

(1) Acquitted of any criminal charge by reason of insanity.

(2) Adjudicated mentally incompetent.

(3) Treated in a hospital for mental illness, drug addiction or alcoholism.

(4) Convicted of a crime of which actual or attempted personal injury or death is an element.

(5) Convicted of a crime in connection with which firearms or dangerous devices were used or found in his or her possession.

(6) Convicted of a crime of which the use, possession or sale of narcotics or dangerous drugs is an element.

6 CMC § 2204(f). These groups of individuals are largely those who are either (1) already forbidden from possessing firearms pursuant to 18 U.S.C. § 922(g) or (2) been subject to presumptively lawful longstanding prohibitions on the ownership of firearms. The fact that the application procedure requires individuals to submit evidence that they do not fall into one of the six prohibited categories does not, as Murphy argues, presume guilt on the part of the applicant. The Commonwealth is merely exercising a gatekeeping function, ensuring that applicants do not fit within one of the prohibited groups.

The basic registration and licensing requirement substantially advances the important government interest in preserving public safety by keeping firearms out of the hands of individuals that would misuse them. Scientific studies demonstrate that registration laws protect public safety by reducing the number of gun-related homicides and suicides. The John Hopkins Center for Gun Policy and Research has carefully examined data in Connecticut and Missouri and concluded that there is a significant connection between licensing and registration laws and a reduction in firearm deaths. In Connecticut, the adoption of a permit-to-purchase law reduced gun-related homicides by 40 percent over ten years. Rudolph, *supra*. At the same time, the rates of other homicides did not decline. *Id*. In Missouri, the repeal of licensing laws led to a 25 percent increase in gun-related homicides. Wester, *Effects of the Repeal*, *supra*; Wester, *Erratum*, *supra*. Over the same time period, suicides reduced in Connecticut but rose in Missouri. Crifasi, *supra*. Studies such as these demonstrate that registration and licensing laws substantially advance the government's interest in protecting public safety by preventing firearms from falling into the hands of those that would

misuse them.

### 3. *4 CMC § 1402 passes intermediate scrutiny.*

The temporary confiscation of firearms entering the Commonwealth until taxes have been paid and the firearm has been registered is constitutional because intermediate scrutiny applies and the measure passes intermediate scrutiny. As an initial matter, the challenged portion of 4 CMC § 1407(b) is better seen as a registration measure than a tax measure. The proper remedy for a tax being found unconstitutional is to strike down the individual tax, rather than to strike down portions of a customs statute that references all taxes that may be applicable to a given item. It is evident that Murphy is not challenging § 1407(b) as it applies the $1000.00 tax on pistols, and to the extent he is, a separate analysis of that provision is appropriate, and is conducted below. Rather, Murphy is challenging the aspects of § 1407(b) that require customs to withhold an imported firearm until the firearm is registered and the individual that is to take possession of the firearm has a WIC. Finally, this provision is best seen as a part of the Commonwealth's registration scheme in light of the Commonwealth's unique power over its customs territory. The registration provision closes a potential loophole that would allow an individual to acquire a firearm without first complying with the Commonwealth's licensing and registration requirements.

As explained above, the basic registration and licensing requirements are presumptively lawful. However, unlike the previous section, § 1407(b) does not impose a de minimus burden, and there is no longstanding regulation of firearms specifically. Therefore, intermediate scrutiny is appropriate because the requiring a WIC and the registration of a firearm make it more difficult to acquire a firearm by bringing it into the Commonwealth. However, the burden is not severe enough to warrant strict scrutiny because it does not ban the *possession* of firearms, *Heller II*, 670 F.3d at 1258, it merely requires an individual to obtain a license and register the firearm before taking possession.

Section 1407(b) passes intermediate scrutiny for the same reasons that the registration requirements pass intermediate scrutiny. Section 1407(b) merely closes a loophole. Without § 1407(b), an individual prohibited from possessing a firearm could not legally obtain a firearm in the Commonwealth, but could obtain one outside of the Commonwealth and simply bring it into the Commonwealth to avoid the registration and licensing requirement.

## D. STORAGE PROVISIONS OF SAFE ARE CONSTITUTIONAL.

The storage provisions of SAFE §§ 204 and 206, codified at 6 CMC §§ 10204 and 10206, are constitutional because intermediate scrutiny applies and the laws pass intermediate scrutiny. The Commonwealth will largely rest on the argument presented in its Cross Motion for Summary Judgment, ECF No. 98. However, the Commonwealth will address below certain aspects of Murphy's argument.

### 1. *6 CMC § 10204*

The storage provisions of § 10204 survive Murphy's arguments. Murphy's challenges are (1) that § 10204 resembles the statute found unconstitutional in *Heller I*; (2) evidence presented by Murphy demonstrates that § 10204 is not necessary; and (3) § 10204 is not narrowly tailored.

Section 10204 is distinct from the statute found unconstitutional in *Heller I*. First, the requirements are different. The statute at issue in *Heller I* required firearm owners "to keep their lawfully owned firearms, such as registered long guns, 'unloaded and dissembled or bound by a trigger lock or similar device' unless they are located in a place of business or are being used for lawful recreational activities." 554 U.S. at 575. There was no exception allowing an individual to carry their firearm in their home, and the only options were (1) to keep the firearm "unloaded *and* disassembled" or (2) bound by a trigger lock. Taken together, these provisions resulted in a situation in which an individual could not possess operable firearms in their home, and "ma[d]e it *impossible* for citizens to use them for the core lawful purpose of self-defense." *Id.* at 630.

11

Section 10204 is distinguishable. First, unlike the statute in *Heller I*, § 10204(a)(2) gives firearm owner the option of carrying a fully operable firearm on their person in their home for any purpose. Second, there is no requirement that any firearm be kept unloaded. Section 10204(a)(1) gives owners the option of securing an unattended firearm with a trigger lock, securing an unattended firearm (loaded or unloaded) in a locked container. The Parties' expert Officer David Hosono testified that it would take under a minute, as little as 10 seconds, to retrieve an unloaded firearm from a locked container, load it, and have it ready to shoot. Test. of Hosono, ECF No. 100, at 33. If the firearm is loaded, as § 10204 allows, one can safely presume that this timeframe will be shorter.

As to Murphy's second argument, the fact that alternative evidence exists is not fatal to intermediate scrutiny. "In considering a [government]'s justifications for its ordinance, [courts] do not impose 'an unnecessarily rigid burden of proof . . . so long as whatever evidence the [government] relies upon is reasonably believed to be relevant to the problem that the [government] addresses.'" *Jackson*, 746 F.3d at 965 (quoting *City of Renton*, 475 U.S. at 50–52). The Commonwealth legislature was concerned by the same issues confronting San Francisco in *Jackson*. P.L. 19-42 at 4. In its Cross Motion for Summary Judgment, the Commonwealth provided extensive evidence demonstrating the danger that unattended firearms pose to children. The Commonwealth has carried its burden under intermediate scrutiny, alternative evidence that could have been considered by the legislature is of no consequence.

Finally, Murphy argues that § 10204 is not narrowly tailored. Under intermediate scrutiny, the government is not required to adopt the least restrictive alternative. *Jackson*, 746 F.3d at 966. Murphy argues that the scheme in *Jackson* was tailored specifically for handguns. However, the problems posed by unattended firearms are not limited to handguns. An unattended rifle can be just as deadly, if not more so, than a handgun. Furthermore, evidence indicates that unattended

rifles have in fact caused injuries and death in 2016. On June 5, 2016, a ten-year-old girl in St. Louis County reached under her couch blindly, bumped into an unsecured, unattended AR-15, which discharged, shooting her sister in the foot. *Girl, 9, wounded in accidental discharge of assault rifle in St. Louis County*, St. Louis Post Dispatch, June 6, 2016, http://www.stltoday.com/news/local/crime-and-courts/girl-wounded-in-accidental-discharge-of-assault-rifle/article_cbb94fa3-be23-5d6c-ab4b-3a3a2db8adbe.html. On May 30, 2015, a nine-year-old boy found a loaded rifle in a shed, pointed it at his eight-year-old cousin, AND accidentally shot him in the head, killing him. *Ambler boy, 8, dies after being accidentally shot by another child*, Alaska Dispatch News, June 1, 2015, http://www.adn.com/rural-alaska/article/ambler-boy-8-dies-after-being-accidentally-shot-another-child/2015/06/02/. Finally, unattended rifles and shotguns are just as susceptible as handguns to being stolen, and subsequently used in crimes. Section 10204 is narrowly tailored for the purposes of intermediate scrutiny.

> 2. *Challenge to 6 CMC § 10206 is not a challenge to the Commonwealth's lack of a carry regime.*

It is clear from Murphy's Cross Motion for Summary Judgment, ECF No. 97, that he is not arguing that the absence of an open or concealed carry regime exists. Murphy focuses on the requirement that firearms being transported must be secured in a locked container separate from ammunition. For the reasons highlighted in the Commonwealth's Cross Motion for Summary Judgment, this provision passes intermediate scrutiny. If Murphy wishes to challenge the absence of an open or concealed carry regime, then he should file a complaint stating so explicitly. If the Court interprets Murphy's challenge to § 10206 as a challenge to the lack of a carry regime, then the Court should order additional briefing so the parties can address the issue directly, citing cases that have analyzed the issue of the Second Amendment right to carry a loaded firearm in public.

**E. Intermediate Scrutiny Applies to the Restrictions on Large Capacity Ammunition Feeding Devices and Assault Rifles, and Both Regulations Survive Intermediate Scrutiny.**

Murphy's challenge to the Commonwealth's ban on large ammunition feeding devices or large capacity magazines ("LCMs") and assault weapons fails because intermediate scrutiny applies and the measure passes intermediate scrutiny. While the Commonwealth will largely rest on the arguments it put forward in its Cross Motion for Summary Judgment, ECF No. 98, the Commonwealth will address two important points. First, the restriction on LCMs does not render the firearms Murphy owns, .223 semi-automatic rifles and Glock 19 pistol inoperable. Second, a review of U.S. Courts of Appeals' decisions regarding restrictions on LCMs and "assault weapons" demonstrates that intermediate scrutiny is the most appropriate to restrictions on LCM.

1. *Restricting LCMs does not render Murphy's firearms inoperable.*

Restricting the LCM does not render Murphy's firearm's inoperable. Murphy's argument that strict scrutiny applies to any regulation of LCMs relies on the premise stated in *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016), *reh'g en banc granted*, 636 F. App'x 880 (4th Cir. 2016), that the term "arms" includes any component necessary to make a firearm operable. 813 F.3d at 175. The Commonwealth agrees with this statement of the law. Murphy's argument seems to imply that a restriction on magazine size renders his firearms inoperable. Mem. In Support of Mo. for Summ. J. at 11, ECF No. 97. If this is Murphy's argument, then this is not the case, as ten-round magazines can be purchased for Murphy's Bushmaster AR-15 and Glock 19.

The firearm's owned by Murphy that would be affected by the LCM restriction are his Bushmaster AR-15 and Glock 19. *See* Pl's. List of Exs., Ex. 5, ECF No. 47-6; 4th Amend. Compl. ¶ 21, ECF No. 86. Ten-round magazines are available for Murphy's Bushmaster AR-15. *Bushmaster Factory Direct Replacement Magazine*, Gander Mountain, http://www.gandermountain.com/modperl/product/details.cgi?pdesc=Bushmaster-Factory-Direct

14

-AR-15-Replacement-10-Round-Magazine&i=706935. Ten-round magazines are available for Murphy's Glock 19. *GLOCK Factory G19 Magazine. 10 Rounds*, Glockmeister, http://www.glockmeister.com/GLOCK-Factory-G19-Magazine-10-Rounds/productinfo/G19MAG/. Furthermore, existing magazines can be permanently modified to only accept 10 rounds. *See, e.g.*, *How to Convert a 30-Round Magpul PMAG M3 AR-15 Magazine for Legal California Use*, Instructables.com, http://www.instructables.com/id/How-to-Convert-a-30-Round-PMAG-M3-AR-15-Magazine-f/ (last accessed July 12, 2016). Therefore, the LCM restriction does not render Murphy's weapons inoperable.

> 2. *Reviewing U.S. Courts of Appeals' case law indicates intermediate scrutiny is appropriate to the restrictions on large capacity ammunition feeding devices and assault weapons.*

Five U.S. Circuit Courts of Appeals have considered State restrictions on LCMs and "assault weapons": *Kolbe*, 813 F.3d 160, *Cuomo*, 804 F.3d 242, *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 410 (7th Cir.), *cert. denied*, 136 S. Ct. 447, 193 L. Ed. 2d 483 (2015), *Fyock*, 779 F.3d 991,[4] and *Heller II*, 670 F.3d 1244. *Friedman* is not particularly persuasive because it does not employ the analysis borrowed from First Amendment case law, as do all other circuits, and will not be considered. *See Friedman*, 784 F.3d at 418–20 (Manion, J., dissenting). *Heller II* and *Cuomo* both found that intermediate scrutiny applied to the LCM restriction, whereas *Fyock* held that the district court did not abuse its discretion in applying intermediate scrutiny when denying a preliminary injunction. *Cuomo*, 804 F.3d at 258–61; *Fyock*, 779 F.3d at 998–99; *Heller II*, 670 F.3d at 1256–58. *Kolbe* held that strict scrutiny was appropriate and remanded the case for further proceedings. *Kolbe*, 813 F.3d at 179–82.

> a. Intermediate Scrutiny (*Heller II, Fyock, & Cuomo*)

The intermediate scrutiny cases are best considered in chronological order, starting with

---

[4] *Fyock* is the only case that examines restrictions on LCM alone.

*Heller II*. *Heller II* considered a restriction on assault weapons (D.C. Code § 7-2502.02(6)) and LCMs (D.C. Code § 7-2506.01(b)).[5] 670 F.3d at 1249. The court began by considering whether the regulations impinged upon the Second Amendment. The court assumed the regulations impinged upon the Second Amendment right based on the assumption that assault weapons and LCMs were commonly owned and typically used for lawful purposes. *Id*. at 1261. In evaluating the burden, the Court held that the burden on the Second Amendment right was mitigated by the fact that the challenged laws (1) did not prohibit the possession of handguns, (2) did not "prevent a person from keeping a suitable and commonly used weapon for protection in the home or for hunting, whether a handgun or a non-automatic long gun," and (3) did not "effectively disarm individuals or substantially affect their ability to defend themselves." *Id*. at 1261–62. The court therefore applied intermediate scrutiny. *Id*. The court identified the important government interest as "protecting police officers and controlling crime." *Id*. The court found a substantial ends-means relationship as to assault weapons because the cited evidence demonstrated: (1) the banned features "the military features of semi-automatic assault weapons are designed to enhance their capacity to shoot multiple human targets very rapidly," (2) assault weapons were preferred by criminals, and (3) "fire almost as rapidly as automatics." *Id*. at 1263. As to LCMs, the court held that evidence demonstrated that LCMs (1) "greatly increased the firepower of mass shooters," (2) "result in more shots fired, persons wounded, and wounds per victim," and (3) posed a danger to bystanders because of the "tendency [] for defenders to keep firing until all bullets have been expended." *Id*. 1263–64.

The next case to consider LCMs, and LCMs alone, is *Fyock*, 779 F.3d 991. The *Fyock* court considered an appeal from a denial of a preliminary injunction, and therefore applied an

---

[5] SAFE's restrictions on "assault weapons" and LCMS are largely modeled after these provisions. *Compare* D.C. Code §§ 7-2501.01(3A)(i)(IV), 7-2502.02(6), and 7-2506.01(b), *with* 6 CMC §§ 10101(e)(1)(i), 10207(b), and 10208(a)(5).

abuse of discretion standard. 779 F.3d at 994. The court noted that due to the sparse historical record, the district court (like the *Heller II* court) assumed that the restriction on LCMs burdened conduct protected by the Second Amendment and assumed that LCMs were not "dangerous and unusual." *Id*. at 997–98. The court found that it was not an abuse of discretion for the district court to apply intermediate scrutiny because the LCM restriction (1) did not prevent individuals from owning a handgun, (2) did not render firearms inoperable, and (3) the measure did not effectively disarm law-abiding individuals. *Id*. at 999. Under intermediate scrutiny, the court found it was not an abuse of discretion to find that public safety and reducing violent crime were important government interests. *Id*. at 1000. The court held it was not an abuse of discretion to find a substantial ends-means relationship because the government presented evidence that (1) "large-capacity magazines results in more gunshots fired, results in more gunshot wounds per victim, and increases the lethality of gunshot injuries," and (2) "that large-capacity magazines are disproportionately used in mass shootings as well as crimes against law enforcement." *Id*.

Finally, *Cuomo*, 804 F.3d 242, considered challenges to New York and Connecticut restrictions on assault weapons and LCMs. 804 F.3d at 249–251. The analysis is similar. The court assumed that the ban on LCMs and assault weapons impinged on the Second Amendment. *Id*. at 255–57. The court found that the restrictions impacted the core of the Second Amendment because it limited law-abiding individuals' choice of weapons to defend their homes. *Id*. at 259. The court classified the restrictions as "a substantial burden." *Id*. at 259–60. However, the court found that burden was substantially mitigated by (1) the fact that the challenged laws "have not banned an entire class of arms"[6] because many semiautomatic weapons were still available, and (2) the laws did "not effectively disarm individuals or substantially affect their ability to defend themselves."

---

[6] The *Cuomo* court noted that "there is no class of firearms known as 'semiautomatic assault weapons'" and that the laws prohibited "only a limited subset of semiautomatic firearms, which contain one or more enumerated military-style features." *Cuomo*, 804 F. 3d at 260.

*Id*. at 260. The court therefore held that intermediate scrutiny was appropriate. *Id*.

The court noted the important government interests were public safety and crime prevention. *Id*. at 261. As to assault weapons, the court noted that the States had provided evidence that assault weapons (1) "tend to result in more numerous wounds, more serious wounds, and more victims," (2) are "disproportionately used in crime, and particularly in criminal mass shootings" and "kill[ing] law enforcement officers," and (3) have "military combat features" that increase the "lethality . . . far beyond that of other firearms in general, including other semiautomatic guns." *Id*. at 262. As to LCMs, the court found that the States had produced substantial evidence that LCMs (1) "present even greater dangers to crime and violence than assault weapons alone, in part because they are more prevalent and can be and are used . . . in both assault weapons and non-assault weapons," (2) "are disproportionately used in mass shootings," and (3) "result in 'more shots fired, persons wounded, and wounds per victim than do other gun attacks.'" *Id*. at 263–64.

### b. Strict Scrutiny (*Kolbe*)

In *Kolbe*, 813 F.3d 160, the U.S. Court of Appeals for the Fourth Circuit considered Maryland's ban on assault weapons and LCMs, and came to a different conclusion by focusing on (1) an alternative characterization of the ban, and (2) the fact that the law regulates conduct in the home. The *Kolbe* court began by examining the historical evidence presented and concluding that the law impinged upon the Second Amendment right because assault weapons and LCMs are commonly possessed by law abiding citizens for lawful purposes and are not "dangerous and unusual." 813 F.3d at 174–78. In doing so, the court focused on the popularity of the AR–15. *Id*. at 174. In considering the burden imposed, the *Kolbe* court concluded that (1) the law banned "the use of a class of arms for self-defense in the home," and (2) because a fundamental right was at issue, the fact that alternative means of self-defense were available did not mitigate the law's burden on the Second Amendment. *Id*. at 179–80; *contra Cuomo*, 804 F.3d at 260. In holding that

strict scrutiny was applicable, the court emphasized that "any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." *Kolbe*, 813 F.3d at 181 (internal quotations omitted) (quoting *U.S. v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011)). Rather than applying strict scrutiny, the court remanded the case for the district court to apply strict scrutiny.

### c. SAFE's Provisions

Reviewing all prior cases along with the unique features of SAFE demonstrates that intermediate scrutiny applies in this case. The Commonwealth will assume, as did the courts in *Heller II* and *Cuomo*, that LCMs and assault rifles are protected by the Second Amendment. Even if this burden is characterized as substantial, there are mitigating factors that lessen the burden.

There are two substantial mitigating factors for assault rifles. First, the Commonwealth's assault rifle ban does not ban an "entire class of arms," regardless of whether the court applies the reasoning in *Heller II* and *Cuomo* or *Kolbe*. Indeed, unlike any of the cases previously considered, the definition of "assault rifle" in 6 CMC § 10101(e)(1)(i) exempts rifles of a caliber .223 or less.[7] Therefore, even under *Kolbe*'s standard, not all semiautomatic rifles with military style features are banned; only those greater than .223 caliber. Second, the Commonwealth's assault rifle ban leaves more alternatives of self-defense[8] open to law abiding individuals than any of the laws previously considered, as individuals will be able to use .223 semi-automatic rifles with military style features for self-defense. The AR–15, which by many accounts is the most popular model of semiautomatic rifle with military features, is available for individuals wishing to defend their

---

[7] The Connecticut law at issue in *Cuomo* is somewhat similar in that it "grandfathered" arms that were properly registered on the effective day of the act. *Cuomo*, 804 F.3d at 251.

[8] Unlike *Kolbe*, Ninth Circuit precedent considers the availability of alternative means of self-defense to be a mitigating factor. *Jackson*, 746 F.3d at 961.

homes with such a rifle.

The major mitigating factor for LCMs is that there are a multitude of alternative means of self-defense. There is no evidence that the LCM restriction renders any firearm inoperable, and all of Murphy's firearms are able to accept 10 round magazines. Furthermore, there is no limit to the number of magazines an individual can own or possess. The LCM restriction does not ban or render any firearm inoperable, but rather only limits the number of rounds available.

The Commonwealth has already provided extensive evidence that the restrictions on assault rifles and LCMs substantially advance the Commonwealth's interest in public safety. The only evidence that should be added is that the LCM restriction further benefits public safety because the "'2 or 3 second pause' during which a criminal reloads his firearm 'can be of critical benefit to law enforcement.'" *Heller II*, 670 F.3d at 1264. For this reason, and the evidence presented in the Commonwealth's Cross Motion for Summary Judgment, intermediate scrutiny applies to the restriction on LCMs and assault rifles, and the evidence presented demonstrates that the restrictions substantially advance the important government interest in public safety.

### F. THE TAXATION ON HANDGUNS IS CONSTITUTIONAL

The $1000 tax in 4 CMC § 1402(h) is a constitutional exercise of the Commonwealth's power to impose excise taxes on articles that cross its borders. First, the primary goal behind the tax is to collect revenue, which is allocated to specific sources under SAFE, PL 19-42, § 15. Courts generally defer to the legislature's power to tax unless the tax at issue falls into a limited category of suspect cases. Second, to the extent that the tax in this case appears to fall within one of the suspect categories, it withstands scrutiny. The tax does not resemble the prohibited legislative activity that the Supreme Court has found to be unconstitutional exercises of the taxation power. This is not a tax whose primary purpose is to impose a penalty, though it may have an incidental deterrent effect. *Child Labor Tax Case*, 259 U.S. 20, 34 (1922). This is also not a facially

discriminatory tax that targets a protected group. *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575 (1983). Finally, to the extent that the tax is subject to Second Amendment analysis, the taxation of firearms is longstanding, dating back to at least the Revenue Act of 1918, and is therefore not properly considered to be within the scope of Second Amendment protection. To the extent the tax burdens the Second Amendment right, the burden is mitigated by the fact that the tax is limited in time.

Before embarking on the analysis, it is necessary to note a number of factors that make the Commonwealth unique. The Commonwealth's authority to levy excise taxes over items crossing its borders, authorized by Covenant[9] § 604(b), sets it apart from the several States. As the Commerce Clause of the U.S. Constitution, Article I, Section 8, Clause 3, is not made applicable to the Commonwealth by the Covenant through § 501(a), there are no dormant Commerce Clause concerns. Therefore, decisions concerning the federal government's power to levy taxes are the best source of authority to consider in this analysis.

      1.  *The tax is a legitimate use of the taxation power.*

The tax is a legitimate and constitutional use of the Commonwealth's taxation power because its primary purpose is to generate revenue, and it is not one of the forbidden activities that are beyond the taxation power or an abuse thereof.

      a.  <u>The tax's primary purpose is revenue generation.</u>

The tax's primary motive is revenue generation. "Taxes are customarily enacted to raise revenue to support the costs of government." *Dep't of Rev. of Mont. v. Kurth Ranch*, 511 U.S. 767, 787 (1994) (Rehnquist, C.J., dissenting). Importantly, "it has long been established that an Act of Congress which on its face purports to be an exercise of the taxing power is not any the less so

---

[9] Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, 48 U.S.C. § 1801 note [hereinafter Covenant].

because the tax is burdensome or tends to restrict or suppress the thing taxed." *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937). It is vitally important to recognize that "[i]nquiry into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it is beyond the competency of courts." *Id*. at 513–14. Neither the extent of the regulatory effect of a tax, or the amount of a tax, can ascribe to the legislative branch "an attempt, under the guise of taxation, to exercise another power denied by the [] Constitution." *Id*. at 514; *Kurth Ranch*, 511 U.S. at 780 ("[N]either a high rate of taxation nor an obvious deterrent purpose automatically marks this tax as a form of punishment.").

Here, the primary purpose of the tax is to generate revenue. The tax is imposed in SAFE, § 14. The next very next section, § 15, specifies how fees generated by SAFE are to be allocated. Under § 15, the revenue generated by SAFE's provisions are to be allocated to various government departments and divisions that will be most affected by the change in law, as well as to procuring security systems for government buildings. As with the $200.00 tax in *Sonzinsky*, the tax here "is productive of some revenue." 300 U.S. at 514. The tax is undoubtedly high at $1000.00, and this high amount may deter individuals from importing pistols until the tax lapses; however, neither of these observations automatically renders the tax suspect. *Kurth Ranch*, 511 U.S. at 780. Finally, it is important to note that, as a general rule at least, courts "are not free to speculate as to the motives which moved Congress to impose it, or as to the extent to which it may operate to restrict the activities taxed." *Id*.

b. The tax is not one of the types of prohibited taxes.

The tax is not one of the forbidden uses of the taxation power because the tax is not penal and does not single out a protected group for unfair treatment. The general rule stated in *Sonzinsky*, *i.e.*, that courts lack the competence to inquire into the purpose of a taxation measure, is not without exception. First, the taxation power cannot be used to exact a penalty. Second, the tax cannot be

22

used to target a protected group for unfair treatment. Comparing the current tax to the cases that stand for these propositions demonstrate that the tax is neither of these forbidden uses.

The tax does not impose a penalty. The seminal case on penal taxes is *Child Labor Case*, 259 U.S. 20. In that case, the Congress created a taxation scheme, administered by the Department of Labor, that imposed a tax amounting to 10 percent of yearly net profits on firms that knowingly used child labor. 259 U.S. at 34. The Court found that the tax was penal and was an attempt by Congress to regulate activity reserved to the States under the Tenth Amendment by disguising the regulation as a tax. The Court in *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, summarized the earlier Court's approach well:

> First, the tax imposed an exceedingly heavy burden—10 percent of a company's net income—on those who employed children, no matter how small their infraction. Second, it imposed that exaction only on those who knowingly employed underage laborers. Such scienter requirements are typical of punitive statutes, because Congress often wishes to punish only those who intentionally break the law. Third, this "tax" was enforced in part by the Department of Labor, an agency responsible for punishing violations of labor laws, not collecting revenue.

132 S. Ct. at 2595. The present tax does not resemble this scheme. First, though the amount of the present tax is high, it does not compare to 10 percent of a firm's net income. *Id*. Furthermore, the amount of a tax will not, alone, suffice to warrant further inquiry. *Kurth Ranch*, 511 U.S. at 780. Second, there is no scienter requirement in the present tax. *Id*. Finally, the tax here is enforced by the Department of Finance, *i.e.*, the agency tasked with collecting taxes and managing the public fisc. *Id*. The tax is not penal.

Neither is the tax is like the tax at issue in *Minneapolis Star*. *Minneapolis Star* involved a tax on the ink and paper used in newspaper production. 460 U.S. at 578. Had the tax ended there, then there is a strong argument that it would have passed constitutional muster. However, the tax went further, enacting a $100,000.00 yearly exemption. *Id*. As a result of the scheme, only 11 publishers, one of which publish 14 of the 388 newspapers in the State, were subject to the tax.

The Court held that the taxation scheme was facially discriminatory: an attempt by Minnesota to specifically target the individual publishers, who were protected by the First Amendment freedom of the press. *Id*. at 582. Furthermore, the Court reasoned that unless "some special characteristic of the press" could "justif[y] differential treatment," there was a strong suggestion that the goal was the suppression of speech, and was presumptively unconstitutional. *Id*. at 585.

The tax is not like the scheme at issue in *Minneapolis Star*. First, the taxation scheme is not facially discriminatory. The scheme applies to individuals and businesses alike, and there is no special scheme designed to single out a small group of individuals. Even if the Court finds that tax singles out pistols for differential treatment, there are special characteristics of pistols that justify differential treatment. For example, the security problems posed by rifles are not as acute: an individual carrying a rifle will have some difficulty concealing it. However, an individual can conceal a pistol in a handbag or briefcase and bring it into government buildings. Furthermore, the tax has federal analogues: 26 U.S.C. § 4181 taxes pistols and revolvers at a different percentage than "other firearms." A broad holding that firearms are immune from taxation, or that different arms cannot be taxed differently, would undermine this counterpart federal law. Both laws are not facially discriminatory and any differential treatment is justified by the special circumstances of the thing taxed.

2. *Longstanding History of Taxation of Firearms.*

To the extent that Second Amendment analysis applies, there is a longstanding history in the United States of taxing firearms that cross federal borders. Section 900(10) of the 1918 Revenue Act, Pub. L. No. 254, 40 Stat. 1057, imposed a 10 percent tax per firearm on importers. Other laws from this period, specifically laws requiring the registration of handguns, have been found to be longstanding regulations outside the Second Amendment.[10] *Heller II*, 670 F.3d at 1254.

_____

[10] The tax at issue in *Sonzinsky*, 300 U.S. 506, applied to firearms that would be considered

This taxation scheme continues to this day. Title 26, § 4181 of the U.S. Code imposes a tax "upon the sale by the manufacturer, producer, or importer" in the amount of 10 percent for "pistols" and "revolvers," and 11 percent for "firearms (other than pistols and revolvers)" and "shells, [sic] and cartridges." 26 U.S.C. § 4181. Therefore, subjecting firearms to some degree of excise tax is therefore longstanding and is outside the scope of Second Amendment protection.

## IV. CONCLUSION

Murphy is not entitled to summary judgment on any counts because he is not entitled to judgment as a matter of law.

RESPECTFULLY SUBMITTED.

OFFICE OF THE ATTORNEY GENERAL

/s/ *Charles E. Brasington*

DATED: July 14, 2016

Charles E. Brasington
Assistant Attorney General
Attorney for Defendants

---

"dangerous and unusual" under *Heller I*. The Commonwealth accordingly withdraws the argument, made in its Cross Motion for Summary Judgment, that *Sonzinsky* supports a finding that the taxation of firearms is longstanding. Rather, *Sonzinsky* supports the longstanding prohibition on and taxation of dangerous and unusual weapons such as sawed-off shotguns and machine guns. Pistols are not "dangerous" or "unusual." *Radich*, 2016 WL 1212437, at *6–7.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing has been electronically filed this 14th day of July 2016. Further, I certify that a true and correct copy of the foregoing motion was served by electronic mail at paul.murphy.officialmail@gmail.com.


/s/ *Charles E. Brasington*
Charles E. Brasington
Assistant Attorney General
Attorney for Defendants

1